Filed 6/15/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| STEPHANIE STIAVETTI et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> STEPHANIE CLENDENIN, as Director, etc., et al., <br><br>     Defendants and Appellants. | A157553 <br><br> (Alameda County <br> Super. Ct. No. RG15779731) |

Criminal defendants in California who have been found incompetent to stand trial (IST) are committed to the State Department of State Hospitals (DSH) or the State Department of Developmental Services (DDS) (collectively defendants) for receipt of substantive services to restore competency (substantive services), with the goal of allowing criminal proceedings to resume. Yet, instead of being promptly admitted to DSH or DDS, these defendants often remain in county jails for extended periods of time while awaiting transfer. These delays have continued for many years, despite previous court orders and defendants' own attempts to reduce them. This case concerns the maximum constitutionally permissible delay for commencement of substantive services for IST defendants after a trial court has found them incompetent and ordered them committed to DSH or DDS. (See Pen. Code, §§ 1370, 1370.1.)[1]

_____

[1] All further unspecified statutory references are to the Penal Code.

1

Five family members of IST defendants committed to DSH or DDS and two organizations (collectively plaintiffs) filed a petition for writ of mandate and a complaint for declaratory and injunctive relief (petition) challenging statewide delays in the transfer of IST defendants from county jails to DSH and DDS to begin substantive services.

The trial court granted the petition in part, first finding, based on the evidence presented, that defendants systematically violate the due process rights of IST defendants in California who are committed to DSH pursuant to section 1370 or to DDS pursuant to section 1370.1, subdivision (a)(1)(B)(i). The court further found that due process requires defendants to commence substantive services for these IST defendants within 28 days of the date on which the order transferring responsibility for those defendants to DSH or DDS is served. For IST defendants committed to DSH, the court found that the transfer of responsibility date is the date of service of a packet of documents (commitment packet) the court is required to provide under section 1370, subdivision (a)(3). For IST defendants committed to DDS pursuant to section 1370.1, subdivision (a)(1)(B)(i), the court found that the transfer of responsibility date is the date of service of the commitment order, pursuant to 1370.1, subdivision (a)(2). The court phased in the 28-day constitutional deadline for commencing substantive services over a 30-month period.

The court denied the petition as to certain IST defendants charged with felony sex offenses who are committed to DDS pursuant to section 1370.1, subdivision (a)(1)(B)(ii) and (iii), finding that the transfer of responsibility for those defendants does not occur until the defendant and certain required documentation are physically delivered to a DDS facility. The court further

found that plaintiffs had not presented evidence showing that defendants were violating the due process rights of those defendants.

On appeal, defendants contend (1) any uniform statewide deadline for admission of IST defendants is inappropriate and unnecessary, and constitutional limits should be determined on a case-by-case basis; (2) the trial court erred in imposing an arbitrary 28-day statewide deadline for admitting IST defendants to DSH and DDS because that deadline conflicts with precedential case law and is not derived from any relevant statutory or constitutional requirements, and (3) existing policy mechanisms are best positioned to address the mental health crisis at the root of the IST defendant waitlist.

In a cross-appeal, plaintiffs contend (1) the trial court erred in finding that the documentation requirement in subdivision (a)(3) of section 1370.1 absolves DDS of responsibility for timely admission of those IST defendants who have been charged with felony sex offenses and are committed to DDS pursuant to subdivision (a)(1)(B)(ii) and (iii), and (2) equal protection demands a uniform transfer of responsibility point for all IST defendants committed to DDS.

For the reasons discussed in this opinion, we conclude that defendants have systematically violated the due process rights of all IST defendants in California by failing to commence substantive services designed to return those defendants to competency within 28 days of service of the transfer of responsibility document, which is the date of service of the commitment packet for all defendants committed to DSH and the date of service of the order of commitment for all defendants committed to DDS. We shall therefore affirm the judgment as to the issues raised in defendants' appeal, but will reverse as to the issue raised in plaintiffs' cross-appeal.

3

## STATUTORY BACKGROUND

A person cannot be tried or sentenced while mentally incompetent. (§ 1367, subd. (a).) A defendant is deemed mentally incompetent "if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (*Ibid.*) Pursuant to section 1368, if, at any time before judgment in a criminal action, a doubt arises as to the defendant's mental competence, the court shall order a hearing to determine the defendant's competence. (§ 1368.) If, after a hearing, the defendant is found mentally competent, the criminal process shall resume. (§ 1370, subd. (a)(1)(A); 1370.1, subd. (a)(1)(A).) If, however, the defendant is found to be IST, the criminal process shall be suspended until the defendant becomes mentally competent, and the court must make further orders as to the defendant's placement for receiving substantive services. (§ 1370, subd. (a)(1)(B)(i)-(iii); 1370.1, subd. (a)(1)(B)(i)-(iii).)

Under section 1370, DSH is responsible for IST defendants committed due to a mental health disorder. (See § 1367, subd. (b).) Under section 1370.1, DDS is responsible for IST defendants committed due to a developmental disability, and also applies to a person who is incompetent as a result of a mental health disorder, but also has a developmental disability. (*Ibid.*) Neither section 1370 nor section 1370.1 provides an explicit timeframe within which an IST defendant must be admitted to a DSH facility or when substantive services must commence.

### DSH Commitments under Section 1370

When a court finds an IST defendant incompetent to stand trial due to a mental disorder, the trial shall be suspended and "[t]he court shall order the community program director . . . to evaluate the defendant and to submit

4

to the court within 15 judicial days of the order a written recommendation as to whether the defendant should be required to undergo outpatient treatment, or be committed to [DSH] or to any other treatment facility." (§ 1370, subd. (a)(1)(B), (a)(2)(A).)  After receiving the evaluation, "[t]he court shall order the mentally incompetent defendant be delivered by the sheriff to a [DSH] facility . . . , as directed by [DSH], or to any other available public or private treatment facility . . . that will promote the defendant's speedy restoration to mental competence, or placed on outpatient status . . . ." (§ 1370, subd. (a)(1)(B)(i).)[2]

Once the court orders a defendant's commitment, it must provide copies of certain documents prior to the defendant's admission to DSH or other treatment facility where the defendant will be treated.  (§ 1370, subd. (a)(3).) This commitment packet must include the commitment order, a computation of the defendant's maximum term of commitment and credit for time served, criminal history information, arrest reports, court-ordered psychiatric examination or evaluation reports, the community program director's placement recommendation report, records of any finding of mental incompetence arising out of a charge of a felony offense specified in section 290 or a competency proceeding arising out of such a charge, and medical records.  (§ 1370, subd. (a)(3)(A)-(I).)

When the court directs that the defendant is to be confined in a DSH facility, it shall commit the defendant to DSH, which then determines the state hospital to which the defendant is to be admitted.  (§ 1370, subd. (a)(5); see Welf. & Inst. Code, § 7228 [before admitting an IST defendant, DSH

---

[2] Under subdivision (a)(1)(B)(ii) and (iii) of section 1370, the court must commit certain IST defendants charged with felony sex offenses to a state hospital or other secure facility unless the court finds that an alternative placement is appropriate.

5

"shall evaluate each patient committed pursuant to [Section 1370] to determine the placement of the patient to the appropriate state hospital"].)

"Within 90 days of a commitment . . . , the medical director of the [DSH] facility . . . shall make a written report to the court . . . concerning the defendant's progress toward recovery of mental competence . . . ." (§ 1370, subd. (b)(1).) "If the report indicates that there is no substantial likelihood that the defendant will regain mental competence in the foreseeable future, the committing court shall order the defendant to be returned to the court . . . no later than 10 days following receipt of the report." (§ 1370, subd. (b)(1)(A).) IST defendants committed due to a mental disorder may not be confined as IST for more than two years. (§ 1370, subd. (c)(1).)

### *DDS Commitments under Section 1370.1*

When the trial court suspends a trial because the defendant has been "found mentally incompetent and has been determined by a regional center[3] to have a developmental disability" (§ 1370.1, subd. (a)(1)(B)), "[p]rior to making the order directing the defendant be confined in a state hospital, developmental center, or other residential facility, or be placed on outpatient status, the court shall order the regional center director . . . to evaluate the defendant and to submit to the court, within 15 judicial days of the order, a written recommendation as to whether the defendant should be committed to a state hospital, a developmental center, or to any other [approved] residential facility . . . ." (§ 1370.1, subd. (a)(2).)

For most defendants committed under section 1370.1, the court must then "order that the mentally incompetent defendant be delivered by the

---

[3] Regional centers are nonprofit community agencies with which the state contracts, and which coordinate the delivery of services for developmentally disabled individuals. (See *In re Williams* (2014) 228 Cal.App.4th 989, 996, fn. 2 (*Williams*), citing Welf. & Inst. Code, § 4620.)

6

sheriff . . . to a state hospital, developmental center, or any other [approved] residential facility . . . as will promote the defendant's speedy attainment of mental competence, or be placed on outpatient status . . . ." (§ 1370.1, subd. (a)(1)(B)(i).)

For IST defendants with developmental disabilities who are charged with a felony sex offense specified in section 290, where the defendant was previously found IST on a charge of a section 290 offense or is currently the subject of a pending section 1368 proceeding arising out of an offense specified in section 290, "the court shall order that the defendant be delivered by the sheriff to a state hospital or other secure treatment facility for the care and treatment of persons with developmental disabilities unless the court [finds] that an alternative placement" would be more appropriate. (§ 1370.1, subd. (a)(1)(B)(ii).)

For IST defendants charged with a felony offense specified in section 290 who have been denied bail because the court has found a substantial likelihood that the defendant's release would result in great bodily harm to others, "the court shall order that the defendant be delivered by the sheriff to a state hospital for the care and treatment of persons with developmental disabilities unless the court [finds] that an alternative placement" would be more appropriate. (§ 1370.1, subd. (a)(1)(B)(iii).)

"If the court orders that the defendant be confined in a state hospital or other secure treatment facility" pursuant to section 1370.1, subdivision (a)(1)(B)(ii) or (iii), "the court shall provide copies of [certain] documents, which shall be taken with the defendant to the state hospital or other secure

7

treatment facility where the defendant is to be confined." (§ 1370.1, subd. (a)(3).)[4]

Within 90 days of an IST defendant's admission pursuant to section 1370.1, subdivision (a), "the executive director . . . of the state hospital, developmental center, or other facility to which the defendant is committed, shall make a written report to the committing court . . . concerning the defendant's progress toward becoming mentally competent. . . . If the defendant has not become mentally competent, but the report discloses a substantial likelihood the defendant will become mentally competent within the next 90 days, the court may order that the defendant remain in the [facility]." (§ 1370.1, subd. (b)(1).) If, however, "the report indicates that there is no substantial likelihood that the defendant has become mentally competent" (*ibid.*) or if the court determines "that treatment for the defendant's mental impairment is not being conducted" (§ 1370.1, subd. (b)(2)), the defendant must be returned to the committing court either to face proceedings under a long-term civil commitment statute or to be released. (§ 1370.1, subds. (b)(1), (c)(2).)

IST defendants committed due to a developmental disability may not be confined as IST for more than two years. (§ 1370.1, subd. (c)(1)(A).)

## FACTUAL BACKGROUND

### *IST Defendants Committed to DSH*

IST defendants committed to DSH are treated at one of four state hospitals—Napa, Atascadero, Metropolitan, or Patton—or at one of its jail-

---

[4] Those required documents include criminal history information, arrest reports, and records of a finding of mental incompetence arising out of a charge of a felony offense specified in section 290 or a pending proceeding arising out of such a charge. (§ 1370.1, subd. (a)(3)(A)-(C).)

based competency treatment programs for patients who do not need the higher level of care provided by a state hospital.

DSH has created a patient management unit with a centralized referral intake system for receiving commitment packets and other documents electronically from the court, although some state hospitals still receive documents directly. After a commitment packet is reviewed by the patient management unit, it is electronically delivered to the admitting hospital or jail-based competency treatment program, where staff will double-check the commitment packet and then acknowledge that the patient has been accepted for admission, pending availability of a bed.

Because there is no space at DSH facilities for immediate admission of IST defendants, they are placed on a statewide waitlist based on the date of their commitment order. DSH endeavors to maintain a "first in, first out" system for admission from the waitlist. DSH tracks expected discharges of IST defendants from the state hospitals so it can schedule admissions from the waitlist.

### IST Defendants Committed to DDS

The sole secure DDS facility for treatment of IST defendants with developmental disabilities who are committed to DDS is the Porterville Developmental Center's secure treatment program (Porterville). When a court commits an IST defendant to DDS, the Porterville Regional Project is responsible for facilitating admission and, once it receives notice of a possible admission from the court or a regional center, it starts collecting certain documents as part of a referral packet.[5] The Porterville Regional Project uses

---

[5] About 10 percent of the time, there is a delay in receipt of certain documents, though delay times have been reduced due to trial courts ordering those documents released.

the referral packet to conduct an assessment required by Welfare and Institutions Code section 4418.7, to determine the support and services the IST defendant requires. DDS also conducts an in-person interview.

After the Porterville Regional Project has collected the referral packet documents and completed an assessment, it forwards the referral packet to a clinical team at Porterville for determination of whether the IST defendant can be safely treated there and how he or she can best be served, depending on his or her needs. After final approval by Porterville's executive director, the IST defendant is admitted if there is bed space available. IST defendants are generally admitted to Porterville in the order of their court commitment date.[6]

### *Delays in Admission to DSH and DDS*

The trial court used data from the first half of 2017, only to calculate the days of admission delays for IST defendants committed to DSH and DDS "because it [was] the most current information and the claims in [t]his case are for prospective injunctive relief." The court relied on the calculations set forth in the report of plaintiffs' expert, Dr. Bruce Gage (the Gage report), regarding delays in the process of admitting IST defendants to DSH and DDS.

Calculations from the Gage report showed that for IST defendants committed to DSH between January 1 and June 30, 2017, the mean, or average number of days between trial court commitment and admission to a state hospital was 86 and the median was 89. The mean number of days between receipt of the commitment packet by DSH and admission to a state

---

[6] Some IST defendants are admitted to a state hospital either directly through commitment pursuant to subdivision (a)(1)(B)(ii) or (iii), or due to a finding by the Porterville Regional Project that they cannot be safely served at Porterville.

10

hospital in that time period was 64 and the median was 63.[7]  The court also relied on the Gage report to find that from 2014 through mid-2017, the number of IST defendants referred to DSH generally ranged from 250 to 300 per month and "pending placements gradually increased from approximately 400 in 2014, to approximately 500 in July 2017."  In early October 2017, there were approximately 758 IST defendants on DSH's waitlist for admission.

For IST defendants committed to DDS between January 1 and June 30, 2017, the court relied on calculations from the Gage report showing that the mean number of days from trial court commitment to admission to Porterville was 53 and the median was 52.

Both parties presented evidence showing that DSH and DDS have faced growing demands for admission of IST defendants.  As to DSH in particular, the rate of referrals had been increasing over the previous five years "beyond the ability of [DSH] to admit, creating an increase in the waitlist."  This increase in IST defendants in California was part of "a nationwide problem," for which "the causal factors" were being investigated.

Defendants also presented evidence that they "are working within budgetary constraints, are trying to make improvements, and are improving steadily."  For example, DSH had been working to increase beds for IST defendants and to expand jail-based competency treatment programs.  DSH's efforts also included securing funding from the Legislature for counties to

_____

[7] The court observed that defendants did not challenge Dr. Gage's calculation of mean and median wait times and that defendants' expert, Dr. Joseph A. Krock, " 'did not find any irregularities in the way [Dr. Gage] processed the data.' "  The court observed that defendants' evidence also suggested significant wait times, "though less than the wait times calculated in the Gage report."

11

establish mental health diversion programs and other community-based programs.  However, despite all of these efforts, "the number of referrals from the counties continue[d] to outpace the number of admissions by DSH . . . ."

DDS has also worked with the Legislature to provide treatment for individuals with developmental disabilities more promptly, leading to a 2015 increase in bed capacity of approximately 25 percent at Porterville, as well as creation of specialized enhanced behavior support homes in the community, which were intended in part to lessen civil commitments to Porterville.  (See Welf. & Inst. Code, § 7502.5, subd. (a)(2).)  As a result of these efforts, by December 2017, the number of IST defendants on the waitlist for admission to Porterville had been reduced from approximately 50 in 2014, to less than 15 in December 2017.  Indeed, Sherrie Molina, community liaison representative for the Porterville Regional Project, could not recall a time in 2017 when a bed was unavailable for an IST defendant at Porterville once the referral packet was complete and DDS was ready to admit the defendant.  However, despite DDS's efforts, its admission wait times have remained stable since 2016, at above 50 days.

In his report, Dr. Gage considered various external factors that might contribute to delays in admission to DSH and DDS, including receipt of required documents from the court and transporting the defendant, but found that none of these factors was a significant source of delay compared to the delays resulting from defendants' own admissions processes.  Although lack of capacity was the primary driver of the waitlists for DSH, "once capacity is increased, the admission process will become a source of delay."  Dr. Gage therefore concluded that "admission [to DSH] within 14 days should be achievable even with the current unwieldy and burdensome process."  Dr. Gage further found that "[u]nlike DSH, DDS has been able to reduce the

waiting list . . . , suggesting that bed availability is not presently the primary problem. Thus, it is likely the admissions process itself that is currently driving waiting times. [¶] After receiving *the necessary admissions material*, DDS should admit patients within two weeks as well."[8]

Finally, plaintiffs presented evidence that IST defendants suffer harm when incarcerated for a substantial period of time in jail before transfer to a facility for treatment, which affects the likelihood of their return to competence. Plaintiffs' experts on mental health issues, Dr. Terry Kupers and Dr. Melissa Warren, each described the various ways in which defendants with serious mental illnesses or developmental disabilities are harmed by these delays.

In his report, Dr. Kupers summarized the harms to jailed IST defendants with mental health disorders: "Because of crowding, violence, isolation, the frequent use of force by staff and relatively inadequate mental health treatment and rehabilitation programs, individuals with serious mental illness are at risk of harm while incarcerated in the jail." Based on these factors, Dr. Kupers concluded "to a reasonable degree of medical certainty that the longer an individual suffering from serious mental illness is consigned to jail, likely including time in isolation, and is not provided adequate mental health treatment, the worse his or her condition, disability and prognosis, and therefore the less likely there will be a restoration of competence (or, in a certain proportion of cases, the longer it will take for competence to be restored)."

---

[8] Dr. Gage also discussed some of the other potential sources of delay in treating IST defendants, including, inter alia, both DSH and DDS failing to fully utilize community-based competency restoration options.

13

In her report, Dr. Warren summarized the harms to jailed IST defendants with developmental disabilities: "Relative to other inmates, inmates with intellectual disabilities are more vulnerable to abuse and exploitation. Typically, they are subject to more types of abuse, a higher frequency of abuse, and abuse by multiple perpetrators. [¶] Inmates with intellectual disabilities are typically removed from the general population and housed in more restrictive, more isolating and more austere conditions. The loss of environmental cues, behavioral supports, and isolation has a deleterious effect upon their cognitive, emotional, and behavioral functioning. Their condition may deteriorate rapidly. [¶] Inmates with intellectual disabilities are more adversely affected by social isolation compared to other inmates. They often lack the necessary coping and adaptive functioning skills to tolerate the social and sensory deprivation of isolation cells. [¶] . . . [¶] The longer an inmate with an intellectual disability remains in jail, the more likely he or she is to suffer harm."

## PROCEDURAL BACKGROUND

Plaintiffs include five individuals—Nancy Leiva, Stephanie Stiavetti, Kellie Bock, Kimberly Bock, and Rosalind Randle—family members of IST defendants who were allegedly harmed while awaiting admission to DSH or DDS—and two organizations, the American Civil Liberties Union of Northern California and the American Civil Liberties Union of Southern California.

On July 29, 2015, plaintiffs filed a petition for writ of mandate and complaint for declaratory and injunctive relief against Pamela Ahlin and Santi J. Rogers in their then-capacity as directors of DSH and DDS,

14

respectively,[9] alleging three substantive causes of action for violating IST defendants' state due process rights; their state right to a speedy trial; and their federal due process rights, by failing to timely accept transfer of IST defendants held in county jails. As a remedy, plaintiffs requested issuance of a declaration that defendant's delays in admitting IST defendants violated their due process and speedy trial rights, and issuance of a writ of mandate and an injunction directing defendants to admit persons found incompetent to stand trial within a constitutionally permissible time following an order of commitment to DSH or DDS.

In a subsequent motion for peremptory writ of mandate filed on January 25, 2018, plaintiffs specifically requested that the court order (1) DSH to admit all IST defendants within the later of 21 days from receipt of the commitment order or 14 days from receipt of the commitment packet, and (2) DDS to admit all IST defendants within 21 days of receipt of the commitment order.

On April 19, 2019, following extensive briefing; presentation of evidence by both parties in the form of depositions, declarations, expert reports, and related documentation; and two hearings devoted to arguments of counsel, the court issued an amended order granting in part the petition for writ of mandate.[10]

In its 48-page order, the trial court addressed "whether persons found incompetent to stand trial and committed to the DSH or DDS have a constitutional due process right to substantive services within some time

---

[9] We recently granted defendants' request to substitute Stephanie Clendenin, the current director of DSH, in place of Ahlin, and Nancy Bargmann, the current director of DDS, in place of Rogers.

[10] This amended order included corrections of typographical errors from the court's initial order, issued on March 22, 2019.

period, whether the DSH and DDS have system wide failures to provide due process, and what remedy is appropriate."

The court concluded that IST defendants do have a constitutional right to substantive services within a reasonable period of time and that defendants had violated the due process rights of IST defendants committed to DSH under section 1370, and IST defendants committed to DDS under subdivision 1370.1, subdivision (a)(1)(B)(i). The court also found, however, that defendants had not violated the due process rights of IST defendants committed to DDS under subdivision 1370.1, subdivision (a)(1)(B)(ii) and (iii). The court summarized the various deadlines for commencing substantive services for these three categories of IST defendants, as follows.

"Constitutional due process requires that DSH must commence substantive services to restore an IST defendant to competency within 28 days of the transfer of responsibility for an IST defendant to DSH. For the DSH, the 'transfer of responsibility' date is the date of service of the [section] 1370[, subdivision] (a)(3) commitment packet. The evidence shows that DSH systematically fails to provide due process.

"Constitutional due process requires that DDS commence substantive services to restore an IST defendant to competency within 28 days of the transfer of responsibility for an IST defendant [committed] to DDS. For the DDS, for commitments under [section] 1370.1[, subdivision] (a)(1)(B)(i), the 'transfer of responsibility' date is the date of service of the [section] 1370.1[, subdivision] (a)(2) order directing the IST defendant be confined in a DDS facility or placed on DDS outpatient status.[11] For commitments under

_____

[11] The court found that the 28-day deadline runs from the transfer of responsibility point until the commencement of substantive services, rather than until admission, since the purpose of the suspension of criminal proceedings and the transfer of the defendant is for the purpose of providing

16

[section] 1370.1[, subdivision] (a)(1)(B)(ii) or (iii), the 'transfer of responsibility' date is the date the IST defendant and the [section] 1370.1[, subdivision] (a)(3) documentation are delivered to a DDS facility."

The court phased in the requirement that DSH and DDS "commence substantive services for all IST defendants within 28 days from the transfer of responsibility date" over 30 months, beginning with a 60-day deadline within 12 months of the court's order. In addition, the court stated in its order that "[t]he phrase 'all IST defendants' is to be read as 'substantially all IST defendants.' The DSH and the DDS will not be in violation of the judgment if they show good cause for not admitting a few IST defendants within the required timeframes."

Also, on April 19, 2019, the court issued its judgment.[12]

On June 13, 2019, defendants filed a notice of appeal. On July 2, 2019, plaintiffs filed a notice of cross-appeal.[13]

---

those services. In addition, for all defendants committed to DSH and those defendants committed to DDS under subdivision (a)(1)(B)(i) of section 1370.1, the court measured the 28-day time limit for transfer of responsibility from the date of service of the document that transfers responsibility, which would be two days for electronic service and five days for service of such a document by mail.

The court also found that baseline medical services provided by county jails do not constitute "substantive services" for purposes of its order, although DSH or DDS could provide "substantive services through a state hospital, treatment facility, outpatient program, jail based competency program, or other facility or program under their supervision."

[12] On April 24, 2019, the court approved as to form plaintiffs' proposed writ of mandate. However, according to the parties, no writ of mandate has yet been issued.

[13] On November 19, 2020, this court granted the unopposed application of the California Public Defenders Association and the Contra Costa County Public Defender for leave to file an amicus curiae brief in support of plaintiffs, in which it argued that the trial court "acted well within its

17

## DISCUSSION

### I. *Standard of Review*

The parties disagree about the applicable standard of review. Defendants argue that we should review the entirety of trial court order de novo because "[t]he material facts are not in dispute, and the issues raised are purely questions of law." Plaintiffs argue that the trial court's determination of "the scope and necessity of equitable relief" should be reviewed for an abuse of discretion, while "the purely legal question of whether IST defendants have a due process right to timely competency treatment" should be reviewed de novo.

In *In re Loveton* (2016) 244 Cal.App.4th 1025, 1028 (*Loveton*), a panel of this Division set forth the general rule regarding review of a permanent injunction: " ' "The trial court's decision to grant a permanent injunction rests within its sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion. [Citations.] Notwithstanding its discretionary component, a permanent injunction must be supported by substantial evidence in the record. [Citation.] [¶] . . . . [Moreover], when

---

discretion to order a 28-day statewide admission deadline [for DSH] commencing from the date of service of the commitment packet and that the order is not only reasonable, but necessary."

We have granted defendants' unopposed request for judicial notice of (1) the "Consumer Population Categories" subsection of the "Whom DDS Serves" section of DDS's Fact Book for fiscal year 2017-2018; (2) the "State Operated Facilities Program" section of the "Governor's Budget Highlights" for DDS for fiscal year 2020-2021, dated January 2020; and (3) "The Community Care Collaborative Pilot" subsection of the Governor's highlights for DSH for fiscal year 2020-2021, showing the proposed budget and estimates for DSH's contracted outpatient services. We have also granted plaintiffs' unopposed request for judicial notice of DSH's "May Revision Highlights," dated May 14, 2020, showing revisions to the Governor's fiscal year 2020-2021 budget for DSH.

reviewing the interpretation and application of a statute where the ultimate facts are undisputed, we exercise our independent judgment to determine whether the injunction was proper. [Citations.]' [Citation.]" (*Loveton*, at pp. 1042–1043; see also *In re Butler* (2018) 4 Cal.5th 729, 738-739 (*Butler*) [standard of review for a ruling on a motion to modify or vacate an injunctive order is abuse of discretion, while court's legal conclusions are reviewed de novo and its factual findings are reviewed for substantial evidence]; *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712 [abuse of discretion standard "is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review[:] The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious"], fns. omitted.)[14]

Based on the relevant law, we conclude it is appropriate to review for an abuse of discretion the trial court's weighing of the evidence presented and its balancing of the competing interests involved in determining the necessity for and scope of equitable relief. To the extent the court interpreted relevant statutory and constitutional requirements, our review is de novo. Finally, we review the court's factual findings for substantial evidence. (See *Butler*, *supra*, 4 Cal.5th at pp. 738–739; *Loveton*, *supra*, 244 Cal.App.4th at pp. 1042–1043.)

---

[14] Although the trial court in this case did not grant injunctive relief, but instead granted plaintiffs' petition for writ of mandate, neither party suggests that a different standard of review is therefore applicable. (Cf. *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442.)

19

## II. *Relevant Constitutional Provisions and Case Law Concerning the Rights of IST Defendants*

"Both the federal and state Constitutions compel the government to afford persons due process before depriving them of any [liberty] interest. (U.S. Const., 14th Amend. ['nor shall any state deprive any person of life, liberty, or property, without due process of law']; Cal. Const., art. I, § 7, subd. (a) ['A person may not be deprived of life, liberty, or property without due process of law . . .'].) In light of the virtually identical language of the federal and state guarantees, we have looked to the United States Supreme Court's precedents for guidance in interpreting the contours of our own due process clause and have treated the state clause's prescriptions as substantially overlapping those of the federal Constitution. [Citation.]" (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 212. (*Today's Fresh Start*).)

In *Jackson v. Indiana* (1972) 406 U.S. 715 (*Jackson*), the United States Supreme Court addressed the liberty interests of IST defendants placed in state hospitals for indefinite periods of time. The court found that, "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." (*Id.* at p. 738.) The court therefore held that "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future," and that the "continued commitment must be justified by progress toward that goal." (*Ibid.*)

In *In re Davis* (1973) 8 Cal.3d 798, 801 (*Davis*), the California Supreme Court "adopt[ed] the rule of the *Jackson* case that no person charged with a

20

criminal offense and committed to state hospital solely on account of his incapacity to proceed to trial may be so confined more than a reasonable period of time necessary to determine whether there is a substantial likelihood that he will recover that capacity in the foreseeable future."[15]  Our high court also "accept[ed] *Jackson's* premise that due process demands that the duration of commitments to state hospitals must bear some reasonable relation to the purpose which originally justified the commitment." (*Davis*, at p. 805.)

More recently, a number of California Courts of Appeal have relied on the due process principles set forth in *Jackson* and *Davis* to address a related issue involving defendants found incompetent to stand trial:  what constitutes a reasonable period of time for IST defendants to be held in a county jail after a court orders them committed to a state hospital or Porterville, but before they are admitted and treatment is begun?  (See *Williams*, *supra*, 228 Cal.App.4th at p. 1013 ["Although the court in *Davis* referred to commitment to a 'state hospital,' the same due process concerns apply when someone is being held in confinement prior to transportation to such hospital or other facility"]; see also *Craft v. Superior Court* (2006) 140 Cal.App.4th 1533, 1545, ["Because commitment and treatment are the intertwined rationales for suspending criminal proceedings against a mentally incompetent defendant [citation], it follows that where there is no commitment and no treatment, the time an incompetent defendant spends in jail is unnecessary and implicates not only due process, but also counts

---

[15] Following the decision in *Davis*, "section 1370 was amended to ensure there is no indefinite commitment of incompetent defendants in criminal cases." (*In re Mille* (2010) 182 Cal.App.4th 635, 643 (*Mille*); see § 1370, subd. (c); see also § 1370.1, subd. (c).)

21

towards a finding of prolonged incarceration under the state constitutional speedy trial guarantee"].)

Given the "snowballing wait times" for admission to state hospitals, "courts began adding admission deadlines to their commitment orders to protect IST defendants' constitutional and statutory rights . . . . [Citations.] These admission deadlines ranged from as short as 14 days to as long as 60 days from issuance of the commitment order. [Citations.] DSH nevertheless continued not to admit IST defendants in a timely manner, leaving them to languish in county jail." (*In re Kareem A.* (2020) 46 Cal.App.5th 58, 64 (*Kareem A.*).)

First, in *Mille*, *supra*, 182 Cal.App.4th at page 640, an IST defendant committed under section 1370 filed a petition for writ of habeas corpus 30 days after the trial court's order of commitment based on the failure to transfer him to a state hospital. The trial court denied the petition and the defendant was not transferred to a state hospital until 84 days after the commitment order issued. (*Id.* at p. 638.) In a 2010 opinion, Division Three of the Second District Court of Appeal stated that, in light of the constitutional requirements set forth in *Jackson* and *Davis*, "when the court orders a defendant committed to a state mental hospital for treatment that will promote a defendant's 'speedy restoration to mental competence' (§ 1370, subd. (a)(1)(B)(i)), the court must also ensure that the defendant is actually transferred to the state hospital within a reasonable period of time." (*Mille*, at p. 650.) The court further stated: "What constitutes a reasonable length of time will vary with the context. Here, the discrete issue is what constitutes a reasonable time to effectuate a transfer from the county jail to a state mental hospital for evaluation and treatment, in light of the requirement that the hospital report back to the court within 90 days concerning the defendant's

22

progress toward recovery of mental competence.  (§ 1370, subd. (b)(1).)" (*Mille*, at p. 649.)  The appellate court held that, "in view of the statutory time constraint," 84 days was not an acceptable delay and the defendant's habeas petition, filed 30 days after his commitment order, should have been granted.  (*Id.* at p. 650.)

Shortly thereafter, in *Williams*, *supra*, 228 Cal.App.4th at pages 1013–1015, Division Eight of the Second District Court of Appeal relied on *Jackson* and *Davis* in addressing the due process time limits for placing an IST defendant with a developmental disability in the appropriate facility, pursuant to section 1370.1.  The court found that "[w]hile there may be no firm deadline" for admission in section 1370.1, "based on the record in this case, the two years that passed between the time the trial court found Williams incompetent and the time it ordered him placed in the county jail for treatment is unreasonable."  (*Williams*, at p. 1014.)  As the court explained:  "Due process does not permit someone declared incompetent to be confined for such a long period of time without receiving any treatment, much less without a determination that there is a substantial likelihood the person will attain competency in the foreseeable future."  (*Id.* at p. 1015.)  The court directed that within 45 days of the finality of the opinion, the trial court was to order the defendant placed in a facility "and to ensure that such placement occurs forthwith."  (*Id.* at p. 1018.)

The *Williams* court observed that the case before it "reflects a statewide problem in finding adequate housing for persons declared mentally incompetent to stand trial, especially those who are developmentally disabled.  We urge the legislative and executive branches to work towards finding a solution to this problem to ensure that persons found mentally incompetent are provided the treatment they require and are not released

23

onto the streets where they may pose a significant risk to themselves and to public safety." (*Williams, supra,* 228 Cal.App.4th at pp. 1018–1019.)

Subsequently, in *People v. Brewer* (2015) 235 Cal.App.4th 122 (*Brewer*), the Third District Court of Appeal addressed the validity of a standing order in Sacramento County requiring the transfer of IST defendants to DSH within 14 days of the order of commitment. The court rejected DSH's separation of powers challenge, stating: "In setting a deadline for transfer, a court is *not* rewriting or adding to the statute. Instead, the court is enforcing the statutory imperative for a meaningful progress report within 90 days of the commitment order. The court can do this only by 'ensur[ing] that the defendant is actually transferred to the state hospital within a reasonable period of time.' [Citation.] Setting a deadline—establishing the outer limit of a reasonable time—does not violate the separation of powers doctrine. A court acts within its constitutional core function and does not violate the separation of powers doctrine when it interprets and applies existing laws and carries out the legislative purpose of statutes. [Citation.]" (*Id.* at p. 137, quoting *Mille, supra,* 182 Cal.App.4th at p. 650.)[16]

The following year, in *Loveton,* this court addressed a DSH challenge to the trial court's standing order setting a deadline of 60 days from the order of

---

[16] The dissenting Justice in *Brewer* disagreed with the majority's conclusion: "There is no rational or constitutional justification for affording Sacramento County's IST defendants preference over defendants from other counties. Indeed, the effect of doing so is to encourage other superior courts . . . to impose their own arbitrary orders on the beleaguered [DSH]. Chaos ensues." (*Brewer, supra,* 235 Cal.App.4th at p. 154, conc. & dis. opn. of Nicholson, J.)

The *Brewer* court ultimately dissolved the trial court's standing order pending reconsideration on remand of DSH's motion to set aside that order, based on recent changes in the relevant law. (*Brewer, supra,* 235 Cal.App.4th at p. 143.)

commitment to admission of IST defendants in Contra Costa County to DSH-Napa. (*Loveton*, *supra*, 244 Cal.App.4th at p. 1028.) We first found that the court's order did not violate the separation of powers doctrine by "insert[ing] a transfer deadline into section 1370. Rather, in setting the 60-day deadline, the court established an 'outer limit' of what constitutes a reasonable time for transfer of Contra Costa County IST defendants to DSH-Napa in order to meet the statutory 90-day reporting deadline. [Citations.]" (*Id.* at p. 1044, quoting *Brewer*, *supra*, 235 Cal.App.4th at p. 137.)

We further found that the trial court did not undermine DSH's discretion to conduct individualized assessments of IST defendants by imposing a 60-day time limit in Contra Costa County: "In crafting its order, the trial court examined several competing interests: Contra Costa County IST defendants' due process right to receive treatment within a reasonable period of time; the statutory requirements of section 1370, subdivision (b)(1); and DSH-Napa's interest in providing uniform treatment to all 39 counties [within its treatment area]. The court then carefully balanced all of these interests, and found that 60 days was the outside limit for ensuring timely admission to DSH-Napa for Contra Costa County IST defendants. [Citation.]" (*Loveton*, *supra*, 244 Cal.App.4th at p. 1044.) Finally, we rejected the contention raised in the petitioners' cross-appeal that due process required that the time limit in the standing order for admission of Contra Costa County IST defendants to DSH-Napa be reduced from 60 to 30 days based, again, on the court's balancing the particular interests involved. (*Id.* at p. 1047.)[17]

---

[17] Because of the recent amendments to section 1370, we remanded the matter to the trial court to modify its standing order to reflect those statutory changes. (*Loveton*, *supra*, 244 Cal.App.4th at p. 1048.) The modified order provided, inter alia, that pursuant to amended subdivision (a)(5) of section

In 2019, following our decision in *Loveton* and the trial court's modification of the standing order, Division Four of this District upheld the trial court's award of monetary sanctions to a group of Contra Costa County IST defendants for violations of the 60-day time limit for admission. (*People v. Hooper* (2019) 40 Cal.App.5th 685, 688–689, 696, 700–701.)

Recently, in *Kareem A.*, the trial court imposed monetary sanctions against DSH for 247 individual IST defendants who had not been admitted to a state hospital until 60 days or more after the trial court's order to commit each defendant within approximately 30 days. (*Kareem A.*, *supra*, 46 Cal.App.5th at p. 68.) In DSH's consolidated appeals, Division One of the Second District Court of Appeal upheld the sanctions orders. (*Id.* at p. 81.) As relevant here, the court rejected DSH's claim that the trial court's initial commitment orders were improper because this court's decision in "*Loveton* established that 'the constitutional due process standard for the admission of an IST defendant . . . is 60 days from commitment, assuming timely receipt of the patient's intake package,' " rather than the 30-day deadlines imposed by the trial court in that case. (*Id.* at p. 76.) The *Kareem A.* court found that nothing in the record suggested the trial court had failed to balance the same factors as the trial court did in *Loveton* when it determined that the 30-day admission deadline was reasonable in the particular cases before it. (*Kareem A.*, at p. 77.)[18]

_____

1370, IST defendants in Contra Costa County must be placed in a state hospital "within no more than 60 days of the court's order of commitment to DSH, provided the defendant's complete information packet has been received by the hospital or other treatment facility within five days of the commitment order." (*In re Loveton* (Contra Costa County, Apr. 1, 2016), amended order [2016 WL 9825779].)

[18] The court noted that, unlike *Loveton*, the cases at issue there did not involve a standing order for all cases in a particular county, and stated that

The court in *Kareem A.* also rejected DSH's claim that the trial court abused its discretion in finding that DSH did not have good cause and substantial justification for its failure to comply with the commitment orders because it had "ignored the reality of the fact that 'DSH cannot build new beds overnight.' " (*Kareem A., supra*, 46 Cal.App.5th at p. 78.)  On the contrary, the trial court had considered DSH's efforts and had reasonably found that "those efforts did not constitute a valid excuse for continuing to violate the court's orders beyond . . . the 60-day mark that DSH itself advocates as the reasonable outer limit for admission." (*Id.* at pp. 79, 80.)

Most recently, in *People v. Aguirre* (May 24, 2021, No. C088852) ___ Cal.App.5th ___ [2021 WL 2070079], the Third District Court of Appeal affirmed the trial court's award of sanctions to 31 IST defendants in San Joaquin County who were not timely admitted to a state hospital for competency treatment.  The trial court, which had previously sanctioned DSH for such delays on multiple occasions, had explained in the introduction to its order that " '[t]he responsibility to fix the problem falls squarely on the shoulders of [DSH].  This Court is convinced that none of the collaborative efforts over the past several years have given [DSH] sufficient incentive to carry out that responsibility, and the problem has not been fixed.  [DSH] continues to violate the Court's orders in a large number of cases each year.' " (*Id.* at p. *30, fn. omitted.)  The appellate court concluded the trial court did not abuse its discretion in determining that DSH's "insufficient efforts to address the waitlist problem did not constitute good cause or substantial justification for its repeated violation of a court order." (*Id.* at p. *33.)

---

"we neither approve nor disapprove of a 30-day admit-by limit in any case beyond those presently before us." (*Kareem A., supra*, 46 Cal.App.5th at p. 79, fn. 8.)

### III. *Propriety of Setting A Statewide Constitutional Deadline*
### A. *Whether an Across-the-Board Deadline is Ever Appropriate*

In its order, the trial court first stated that relevant case law "confirm[s] that it is a violation of constitutional due process if a person is deprived of liberty for the sole purpose of providing substantive competency-restoration treatment and the person is confined more than a reasonable period of time necessary without receiving such treatment." Then, considering whether a statewide deadline was necessary to remedy the ongoing violations of California's IST defendants' due process rights, the court considered the extensive evidence in the record, as well as applicable case law.

That evidence included, inter alia, Dr. Gage's calculations that the mean (average) of 64 and median of 63 days from commitment packet to admission to a DSH hospital indicate that the DSH did not provide substantive services to half of the IST defendants until over 60 days after the court served the commitment packet." "The mean (average) of 53 [days] and a median of 52 days from trial court order committing [an] IST defendant to the DDS to admission at a DDS facility indicated that the DDS did not provide substantive services to half of the IST defendants until over 50 days after the court served the commitment order."

The court also looked to relevant Supreme Court and California case law addressing the rights of IST defendants, including *Jackson*, *supra*, 406 U.S. 715; *Davis*, *supra*, 8 Cal.3d 798; *Loveton*, *supra*, 244 Cal.App.4th 1025; *Brewer*, *supra*, 235 Cal.App.4th 122; *Williams*, *supra*, 228 Cal.App.4th 989; and *Mille*, *supra*, 182 Cal.App.4th 635, as well as federal case law addressing *statewide* violations of IST defendants' due process rights, due to delayed admission to state hospitals. (See, e.g., *Oregon Advocacy Center v. Mink* (9th

28

Cir. 2003) 322 F.3d 1101, 1120–1122 (*Mink*); *Trueblood v. Washington State Dept. of Social & Health Services* (W.D. Wash. 2015) 101 F.Supp.3d 1010, 1020–1023 (*Trueblood*), reversed in part on another ground in *Trueblood v. Washington State Dept. of Social & Health Services* (9th Cir. 2016) 822 F.3d 1037, 1046; *Advocacy Center for the Elderly & Disabled v. Louisiana Dept. of Health & Hospitals* (E.D. La. 2010) 731 F.Supp.2d 603, 621–624 (*Advocacy Center*); see also *Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 320 ["While we are not bound by decisions of the lower federal courts, even on federal questions, they are persuasive and entitled to great weight"]; accord, *People v. Bradley* (1969) 1 Cal.3d 80, 86.)

The court determined, based on the evidence of continuing delays and the relevant case law, that DSH and DDS have "systematically failed to provide due process for IST defendants," necessitating a statewide deadline to ensure that competency treatment for those defendants is commenced within a reasonable period of time.[19]

Defendants do not dispute that IST defendants' treatment must begin within a constitutionally reasonable period of time. (See *Jackson, supra,* 406 U.S. at p. 738.) They maintain, however, that the trial court was wrong to impose "an across-the-board deadline" for commencement of services for IST defendants committed to DSH[20] because, for purposes of the federal and state

---

[19] As we shall explain in part VI., *post*, we conclude, as a matter of law, that defendants have failed to provide due process to *all* IST defendants committed to DDS under section 1370.1, not only those committed under subdivision (a)(1)(B)(i) of that statute, as the trial court found. (See *Butler*, *supra*, 4 Cal.5th at pp. 738–739; *Loveton*, *supra*, 244 Cal.App.4th at p. 1043.)

[20] Defendants' briefing first focuses on the inappropriateness of any statewide deadline for the admission of IST defendants with a mental disorder who are committed to DSH pursuant to section 1370. Defendants then separately discuss why they believe an admission deadline for IST defendants with developmental disorders who are committed to DDS is

29

rights to due process,"[w]hat constitutes a reasonable length of time will vary with the context." (*Mille*, *supra*, 182 Cal.App.4th at p. 649; see *Jackson*, at p. 738; *Davis*, *supra*, 8 Cal.3d at p. 801.) Therefore, according to defendants, *Jackson* makes clear that a reasonable length of time for admission of IST defendants must be decided on a case-by-case basis, depending on the factual circumstances.

In *Jackson*, when the United States Supreme Court held that due process precludes an IST defendant from being "held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain [competency] in the foreseeable future," its refusal to articulate what specifically constituted a "reasonable period of time" was not based on the finding such a determination can only be determined from the circumstances of a particular case. (*Jackson, supra,* 406 U.S. at p. 738.) Instead, as the court explained, it was not in a position to address the issue in place of the courts of a particular state: "In light of differing state facilities and procedures and a lack of evidence in this record, we do not think it appropriate for us to attempt to prescribe arbitrary time limits." (*Ibid.*)

As already discussed in part II., *ante*, in recent years, a number of California appellate courts have addressed the increasing delays in admitting IST defendants to DSH and DDS, and have set deadlines for admission either for individual defendants or all defendants within a specific county. (See,

---

particularly inappropriate. Because most of defendants' arguments regarding defendants committed to DSH are applicable to all IST defendants, we will discuss defendants committed to both DSH and DDS in this portion of the opinion and will address the separate arguments defendants advance regarding defendants committed to DDS pursuant to section 1370.1 in part III.B., *post*.

e.g., *Brewer*, *supra*, 235 Cal.App.4th at p. 137 [Sacramento County standing order requiring transfer of IST defendants to DSH within 14 days of order of commitment "establish[ed] the outer limit of a reasonable time" for transfer, and did not violate separation of powers]; *Williams*, *supra*, 228 Cal.App.4th at pp. 1018–1019 [finding that a two-year delay in placement of an IST defendant committed to DDS violated due process, and directing trial court to order defendant admitted to a facility within 45 days]; *Loveton*, *supra*, 244 Cal.App.4th at p. 1044 [trial court properly analyzed evidence and balanced competing interests before issuing a standing order requiring admission of IST defendants in Contra Costa County to DSH-Napa within 60 days of commitment order]; *Kareem A.*, *supra*, 46 Cal.App.5th at p. 77 [in consolidated cases of 247 defendants, trial court had properly balanced relevant factors in deciding that a 30-day admission deadline was reasonable].)

All of these decisions affirm the right of IST defendants to be admitted to DSH or DDS within a reasonable period of time, as well as the need to balance the interests of the IST defendant and defendants to determine an appropriate deadline. Attempts to enforce the constitutional rights of IST defendants on a case-by-case—or even county-by-county—basis have not succeeded, however, because they do not provide the uniformity and predictability essential to effective enforcement.

Considering the evidence of longstanding and continuing delays in admission of IST defendants, the absence thus far of legislative action on this specific issue, and the necessarily piecemeal nature of the remedies imposed by the Courts of Appeal of this state, we conclude the trial court reasonably determined that a uniform statewide deadline is necessary to ensure the commencement of substantive services for these defendants within a

31

"reasonable period of time." (*Jackson, supra,* 406 U.S. at p. 738; see *Butler, supra,* 4 Cal.5th at pp. 738–739; *Loveton, supra,* 244 Cal.App.4th at pp. 1042–1043; cf. *Brown v. Plata* (2011) 563 U.S. 493, 511, 530 [in context of rights of prisoners in overcrowded prisons, United States Supreme Court stated that courts "must not shrink from their obligations to enforce the constitutional rights of all persons," even when the Legislature "has not been willing or able to allocate the resources necessary to meet the crisis"].)

Defendants nonetheless argue that imposition of a statewide deadline is inappropriate because there are a variety of factors, such as waitlists for admission, that can lengthen or shorten due to factors outside of their control. According to defendants, "a fixed across-the-board numerical 'admit-by' deadline is poorly suited to addressing the IST waitlist issue, and will almost certainly result in a deadline that will be either unreasonably short or unreasonably long as the factual circumstances change over time."[21] Other examples offered by defendants regarding when "the reasonable period of time for admission can be affected by a wide variety of factors" include statutory changes, delays in paperwork, whether a patient is experiencing psychiatric acuity, a patient's refusal to leave his or her cell for transport to a treatment facility, or unexpected events such as a surge in IST referrals or a global pandemic.

There will undoubtedly be exceptional circumstances requiring special accommodations, which is why the trial court included in its order the

---

[21] Defendants' expert, Dr. Krock, opined in the trial court that the statement of plaintiffs' expert, Dr. Gage, that " '[t]he state should increase bed-capacity until the waiting list is eliminated and then use quantitative methods to predict future need' is fundamentally incorrect. His proposed solution fails because future capacity needs are not readily knowable and predictable."

provision that, in interpreting its admissions deadlines, "[t]he phrase 'all IST defendants' is to be read as 'substantially all IST defendants.' The DSH and the DDS will not be in violation of the judgment if they show good cause for not admitting a few IST defendants within the required timeframes." The trial court further noted that it "retains the authority to make further amendments to the order or any judgment as warranted by the facts." (See *Butler*, *supra*, 4 Cal.5th at p. 738 ["Courts retain power to vacate or modify [injunctive] orders at any point"].)[22] The fact that delays in admission of individual IST defendants will occasionally be necessary does not justify ignoring the constitutional outer limit for commencement of substantive services for the vast majority of IST defendants whose due process rights continue to be violated.

We also reject defendants' suggestions that as they continue to attempt to reduce delays, "a temporary period of longer-than-normal wait times may be reasonable while the problem is being addressed," and that a court order directing a decrease in wait times is therefore "unnecessary and will not make the process go any faster." The evidence in this and other cases demonstrates, however, that admission delays for IST defendants have continued for many years and that defendants' efforts to remedy the problem have plainly been insufficient, given the increasing delays for DSH in particular since 2015, when this action was filed, and continuing delays for DDS. (See *Kareem A.*, *supra*, 46 Cal.App.5th at p. 66 ["Since its creation, the

---

[22] This same language in the court's order is applicable to defendants' argument that a fixed deadline could "disrupt" defense counsel's ability to use the "off-ramp provision" that was recently added to section 1370 and applies to IST defendants who have regained competence while in jail. (See § 1370, subd. (a)(1)(G).) In the unlikely event that any interference with the off-ramp provision occurs, defendants will have a means to address it.

waitlist" for admission of IST defendants committed to DSH "has grown continuously"]; *Carr v. Superior Court* (2017) 11 Cal.App.5th 264, 272 [sharing other courts' concern about "what appears to be 'a statewide problem in finding adequate housing for persons declared mentally incompetent to stand trial, especially those who are developmentally disabled' "], quoting *Williams*, *supra*, 228 Cal.App.4th at p. 1018.)

Contemplating these longstanding delays, the trial court in this case referred to the *Loveton* trial court's finding in an August 16, 2017 order "that in the three years since the *Loveton* [trial court's] decision the DSH had been provided 'ample opportunity to plan and undertake steps' but that DSH 'was neither diligent nor effective in achieving the stated goal,' " and was failing to comply with the standing order's 60-day deadline for admission.  In light of this history of growing waitlists and delayed admissions, a statewide deadline will ensure that defendants undertake immediate additional measures to ensure timely commencement of competency treatment for IST defendants committed to DSH or DDS.

Like the trial court, we do not ignore the resource limitations or the complexity of the challenges DSH and DDS face.  Still, "given the many years DSH [and DDS] ha[ve] had to address excessive wait times," they simply have "not done enough to warrant continuous excusal from" commencing substantive services for all IST defendants in a timely manner.  (*Kareem A.*, *supra*, 46 Cal.App.5th at p. 79; see also *Loveton*, *supra*, 244 Cal.App.4th at p. 1045 ["we cannot ignore the due process rights of Contra Costa County IST defendants at issue in this case, while simply hoping that DSH will admit them, and all IST defendants, in a more timely manner"].)

**B.** *Special Considerations for IST Defendants Committed to DDS*

Defendants contend that even assuming a uniform deadline is appropriate for IST defendants committed to DSH, it is not appropriate for IST defendants committed to DDS, due to statutory differences between sections 1370 and 1370.1, the need for individualized assessments of developmentally disabled defendants, and the relatively small number of IST defendants committed to DDS.

First, according to defendants, unlike IST defendants admitted to DSH under section 1370, "the Legislature has not imposed any deadline for admission to a treatment facility" for defendants committed to DDS under section 1370.1. They base this statement on the fact that subdivision (b)(1) of section 1370 requires that DSH prepare a progress report for the court "[w]ithin 90 days of a commitment" for IST defendants with mental disorders, while subdivision (b)(1) of section 1370.1 requires that DDS prepare a progress report "[w]ithin 90 days of admission" for IST defendants with developmental disabilities. Defendants read too much into this difference in language.

As plaintiffs point out, the history of section 1370.1 does not explain the distinction and, if anything, suggests that the difference in wording may have been due to inadvertence rather than a purposeful distinction based on a perceived difference between the two populations of IST defendants. Originally, both sections 1370 and 1370.1 required submission of a progress report within 90 days of commitment. (Stats. 1977, ch. 695, § 5, p. 2245.) In 1992, the Legislature reduced the time limit in section 1370.1 for submission of the report to within 60 days of commitment. (Stats. 1992, ch. 722, § 13, eff. Sept. 15, 1992.) Then, in 1996, the Legislature amended section 1370.1,

35

subdivision (b)(1) to its current form, requiring DDS to submit a report within 90 days of admission.  (Stats. 1996, ch. 1076, § 2.5.)[23]

Moreover, regardless of this puzzling history, we do not believe the Legislature could have intended this change in the wording of section 1370.1 to mean that while defendants must admit IST defendants committed to DSH within a reasonable time in order to give meaning to the requirement of a report within 90 days of commitment in section 1370, subdivision (b)(1), there is no outside time limit whatsoever on the admission of IST defendants committed to DDS.  Such an interpretation makes no sense and would raise due process and equal protection concerns.  (See *People v. McKee* (2010) 47 Cal.4th 1172, 1193 ["We construe statutes when reasonable to avoid difficult constitutional issues"]; *Williams*, *supra*, 228 Cal.App.4th at p. 1010 [if statutory language is clear, " 'courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend' "]; cf. *Mink*, *supra*, 322 F.3d at p. 1119, fn. 10.)[24]

---

[23] There is no discussion in the legislative history about the rationale for this change in wording.  Indeed, as plaintiffs point out, the committee reports analyzing the bill misstate the then-existing reporting requirement for defendants committed pursuant to section 1370.1, "suggesting perhaps that this change rested on a faulty understanding of the existing law."  For example, in the final report before passage of the bill, the report states that for DDS, "[e]xisting law requires, within 60 days of *admission* to a facility, a report concerning the defendant."  (Sen. Bill No. 1391, Sen. Bill Analysis, Aug. 31, 1996 (1995-1996 Reg. Sess.), italics added.)  As noted, the statute at the time in fact provided that such a report must be provided to the court within 60 days of *commitment*.  (See Stats. 1992, ch. 722, § 13; former § 1370.1, subd. (b)(2).)

[24] We also observe that while the 90-day statutory reporting deadline in general is a factor to be considered in determining the maximum constitutionally permissible delay, as we shall discuss in part IV.B., *post*, there are other factors that must also be considered, whether the defendant is committed under section 1370 or section 1370.1.

Defendants next argue that a statewide deadline is inappropriate for IST defendants committed to DDS because before those defendants can be admitted to Porterville, "DDS must thoroughly evaluate the patient," and the timing of the evaluation can vary significantly from case to case. (See, e.g., Welf. & Inst. Code, §§ 4502, subd. (b)(1) [individuals with developmental disabilities "shall be provided with the least restrictive conditions necessary to achieve the purposes of the treatment, services, or supports"]; 6510.5 [DDS can refuse to treat a defendant at a developmental center if it "has specifically notified the court in writing that the individual cannot be safely served in that developmental center"].)[25] Defendants also point to factors beyond their control that could affect the timing of a defendant's admission, such as how long it takes DDS to obtain access to the defendant in jail to conduct the in-person assessment, which is permitted—but *not* required—under Welfare and Institutions Code section 4418.7, subdivision (b). (See pt. VI., *post* [setting forth evidence in record about DDS's procedures for admission of IST defendants to Porterville].)

This argument is not convincing. Under subdivision (a)(2) of section 1370.1, a regional center evaluates a defendant and makes a placement recommendation *before* the court makes its commitment order. In addition, both DSH and DDS face administrative hurdles and circumstances not completely within their control, which do not justify the abandonment of any requirement that they admit and treat IST defendants within a

---

[25] Defendants focus in particular on Welfare and Institutions Code section 6510.5, which prohibits a court from ordering an IST defendant committed under section 1370.1 be placed at Porterville if DDS determines that the defendant cannot be safely served there. The evidence, however, shows that DDS determinations that a defendant cannot be safely served at Porterville are extremely infrequent. Again, the trial court's order permits delays in unusual cases upon a showing of good cause.

constitutionally reasonable time. (See *In re Grimes* (1989) 208 Cal.App.3d 1175, 1183 [administrative inconvenience does not justify deprivation of constitutional rights].) The trial court was aware of the statutory and regulatory requirements for DDS admissions and also considered evidence regarding reasons for DDS's current delays, which suggested that excessive delays in the admissions process itself was currently driving the failure to commence substantive services for IST defendants committed to DDS in a timely manner.[26]

Finally, defendants assert that because the number of commitments to DDS is relatively small, with only 77 in 2016, it is appropriate to assess the reasonable time within which such IST defendants must be admitted on a case-by-case basis. However, that there are many fewer commitments to DDS does not mean that ensuring timely commencement of substantive services for defendants with developmental disabilities is unnecessary. Systemic delays have continued for these defendants despite their lesser numbers and the current lack of any significant waitlist. These facts support imposition of a statewide constitutional outer limit to ensure that substantive services are commenced for IST defendants committed to DDS within a reasonable period of time.

### C. Loveton's *60-Day Deadline for Admission of IST Defendants to DSH*

Defendants next argue that even if the trial court may properly impose an across-the-board deadline for admission of California IST defendants to

_____

[26] Indeed, in his report, Dr. Gage opined that, for both DSH and DDS, once a defendant's placement is determined, "two weeks gives ample time to conduct medical and short-term risk assessment, communicate with the jails for clarification of packet information, identify the appropriate facility, provide the information to the receiving facility, and arrange transportation."

DSH, the court would be bound by our decision in *Loveton*, meaning it could only impose the 60-day deadline we found proper in that case. (*Loveton*, *supra*, 244 Cal.App.4th 1025.)

The trial court, however, correctly found *Loveton* distinguishable because in that case neither the trial court nor this court "addressed what due process standard applied statewide or the DSH's statewide practices." *Loveton* involved only one county—Contra Costa—and one state hospital— DSH-Napa. Hence, in finding the trial court's 60-day admission deadline was not an abuse of discretion based on the evidence before it, we explained that the court had properly balanced several competing interests, including "*Contra Costa County IST defendants'* due process right to receive treatment within a reasonable period of time; the statutory requirements of section 1370, subdivision (b)(1); and *DSH-Napa's interest in providing uniform treatment to all 39 counties*" it served. (*Loveton*, *supra*, 244 Cal.App.4th at p. 1044, italics added.)

Importantly, while we found that "the trial court's order realistically places an outside limit on what is statutorily and constitutionally permissible," we also observed "that any solution to the problem of the timeliness of placement of IST defendants at the county level cannot begin to resolve the issue statewide. With a handful of distinct orders across the state, priority in admission is given to defendants from counties with standing orders with the shortest admission deadlines, to the possible detriment of defendants both in counties that have standing orders with longer deadlines and, especially, in counties without standing orders. As noted, we believe the 60-day standing order in this case reasonably balances the various interests involved. Nonetheless, the necessarily piecemeal nature of countywide standing orders in general strongly suggests the ultimate need

for a more uniform, statewide solution." (*Loveton*, *supra*, 244 Cal.App.4th at p. 1047 & fn. 19.)[27]

These passages from *Loveton* make clear that we were not attempting to define an outside constitutional limit for admission to DSH for IST defendants statewide. Instead, given the complexities of imposing a standing order for a single county and a single hospital, while other counties had differing deadlines or no deadline at all, we found that a longer deadline was appropriate. In this case, we are addressing a very different situation involving a statewide order that includes all California counties and all DSH facilities. (Accord, *Kareem A.*, *supra*, 46 Cal.App.5th at p. 76 [rejecting DSH's argument "that *Loveton* established a rigid 60-day admission deadline statewide"].)

Defendants further argue that our determination in *Loveton* that due process required a 60-day outside time limit for admission of IST defendants, like the determinations in *Mille* and *Brewer*, was based on the statutory requirement that DSH prepare a progress report for the court within 90 days after an IST defendant is committed. (See § 1370, subd. (b)(1).) In *Loveton*, we concluded that the trial court had properly found "that a 60-day deadline satisfies IST defendants' due process rights, provides sufficient time for DSH to place each defendant, and allows for timely preparation of the 90-day status report . . . ." (*Loveton*, *supra*, 244 Cal.App.4th at p. 1047, italics added.) This language reflects that the 90-day statutory time limit was one of several factors supporting the trial court's 60-day deadline for Contra

---

[27] Following our opinion in *Loveton*, DSH promulgated regulations requiring that IST defendants on the waitlist be admitted based on the date of their commitment order in place of its previous practice of admitting IST defendants based on efforts to adhere to the various counties' deadlines. (See Cal. Code Regs., tit. 9, § 4710, subd. (a).)

Costa County IST defendants' admission to DSH-Napa.  (See pt. IV.B., *post* [discussing the 90-day statutory reporting requirement].)

## IV. *The Maximum Constitutionally Permissible Delay for Commencement of Substantive Services*

In its April 19, 2019 order, the court stated that "[t]he due process issue presented in this case has two parts:  (1) identifying the point in time when responsibility for an IST defendant transfers to the DSH or DDS and (2) determining the maximum constitutionally permissible delay between the transfer of responsibility and when the DSH or DDS commence[s] substantive services reasonably designed to restore the IST defendant to competency."

### A. *The Transfer of Responsibility Dates for IST Defendants*

As noted, the court explained that the transfer of responsibility point for IST defendants is the date on which the document transferring responsibility for those defendants to DSH or DDS is served, which is the date from which the constitutional outer limit for commencing substantive services is calculated.  The court found that the transfer of responsibility date is different for each of three categories of IST defendants:  those committed to DSH pursuant to section 1370; those committed to DDS pursuant to subdivision (a)(1)(B)(i) of section 1370.1; and those committed to DDS pursuant to subdivision (a)(1)(B)(ii) and (iii) of section 1370.1.

#### 1. *IST Defendants Committed to DSH*

The court found that for DSH, the transfer of responsibility point is the date of service of the commitment packet, explaining:  "The court's delivery of the commitment packet is in the nature of a condition subsequent to the court's commitment order because the commitment order does not become effective until service of the commitment packet."  The court relied on section 1370, subdivision (a)(3)(A)-(I) as implicit support for its conclusion that "[t]he

commitment order is conditional because it cannot be implemented until the court serves the commitment packet on the DSH." (See § 1370, subd. (a)(3) [when court orders a defendant committed to DSH, "the court shall provide copies of the following documents prior to the admission of the defendant to the [DSH] . . . facility where the defendant is to be committed"].)

Neither party quarrels with the court's general determination that the date of service of the commitment packet is the transfer of responsibility date for DSH. Defendants, however, believe that the court's order is "problematic because it is potentially ambiguous as to when the clock starts for the 28-day deadline," due to the fact that the order referred generally to "the commitment packet," rather than to a "complete" commitment packet. According to defendants, "[p]resumably, the court intended to start the clock only once a *complete* [commitment] packet has been transmitted to DSH, and not merely through the transmittal of an incomplete packet." Plaintiffs disagree, arguing that the court intended for the 28-day deadline to run from the date of service of the commitment packet, whether or not it is complete, not from receipt of a complete packet. We believe plaintiffs have the better argument.

The trial court explained that its determination of the transfer of responsibility date for DSH was based on the fact that, under section 1370, subdivision (a)(3), "the court's service of the commitment packet is the last act required before the IST defendant's commitment to the DSH is complete." The court also rejected defendants' argument that under recently promulgated regulations, DSH does not accept responsibility for an IST defendant until the DSH receives, reviews, and approves a complete commitment packet. The court found that this interpretation was "inconsistent with [section] 1370 because it would permit the DSH to decide

42

when it will accept responsibility for an IST defendant."[28]  According to plaintiffs, these statements reflect the court's belief that it would be defendants' responsibility to follow up on any missing documents after receipt of a commitment packet, since it is the court's *service* of the commitment packet—whether or not it is has all of the required documents—that starts the 28-day deadline for commencement of substantive services.

We agree that that the transfer of responsibility point for DSH is the date of service of the commitment packet, not the date DSH considers a commitment packet complete, which would only occur after DSH has received and reviewed the commitment packet to determine if documents are missing and requested any missing documents, and then not until any such documents are subsequently received, reviewed, and approved.  The court was specific in its description of the transfer of responsibility date, as well as its unwillingness to allow DSH to dictate that date based on its review or approval of the commitment packet.  Defendants' interpretation of the court's intended transfer of responsibility date contradicts the court's explanation of its intent.

Moreover, to the extent DSH is concerned about delays in receiving documents required under subdivision (a)(3) of section 1370 to constitute a complete commitment packet that are outside of its control, the record reflects that the time it takes for DSH to receive such documents is *not* a

---

[28] The regulation at issue is section 4716, subdivision (a) of title 9 of the California Code of Regulations, which states that, except as provided in subdivision (b), DSH shall admit an IST defendant "only when a completed commitment packet . . . has been received, reviewed, and approved by [DSH]."  Subdivision (b) of the regulation provides:  "In cases wherein [DSH], upon review, discovers that a commitment packet is incomplete, it shall advise the committing county of any missing documentation within 14 calendar days of such discovery."  (Cal. Code Regs., tit. 9, § 4716, subd. (b).)

significant source of delay. In his report, Dr. Gage stated that his analysis of the data showed "that the time from court commitment to DSH receiving [commitment] packets has varied somewhat but has hovered around two weeks." Dr. Gage also looked at when a commitment packet "is declared complete" by DSH. He cited the deposition testimony of George Maynard, DSH's deputy director of strategic planning and implementation, that DSH considers a packet complete when " 'all the components of the [commitment] packet have been received, all the packet entries [have] been entered into [a computer program], and it's deemed to be a completed packet.' " Dr. Gage continued: "Thus, this is not the actual date that the complete information was received but the date the information was determined to be complete by DSH" and "most Date Completed dates are very close to Approval Date. Only 25% are found to be complete by 5 days and many are pending completion for months. . . . [T]his verifies that this date is not a good measure of when completed information was received. Consistent with this analysis, Michael Barsom[, acting executive director of DSH-Patton,] stated in deposition that packets are typically completed within 1-2 weeks [citation] and are not a source of delay [citation]. Thus, completion of admission packets is not a substantial source of delay."

Dr. Gage also stated that the data, which reflected a mean time of 17 days from commitment order to packet receipt, 22 days from packet receipt to approval, and 30 days from approval to admission to DSH facilities, "demonstrate the DSH delays, as opposed to any delays in getting admission information from the counties, account for most of the time from commitment to admission." Moreover, while it was not clear from the data "how much of the 22 days between receiving the packet and approving admission is due to

waiting for additional information to complete the packet, . . . the deposition testimony cited indicates this is not a significant source of delay."

The record thus strongly suggests that delays in receipt of required documents are in large part a result of DSH's own administrative processes, rather than delays by the court or the counties in submitting those documents to DSH. This evidence supports our conclusion that the trial court reasonably found that the transfer of responsibility date for commencement of substantive services is service of the commitment packet, whether or not that packet is yet complete. Again, under the court's order, DSH may request that the court find good cause for delay in an unusual case in which receipt of required documentation is unreasonably delayed due to causes beyond its control. (Compare *Loveton*, *supra*, 244 Cal.App.4th at p. 1036 [60-day deadline for admission ran from earlier date of commitment order, assuming a complete commitment packet was received within five days of that order and, if not received within that time period, DSH could request an extension for filing 90-day report].)

## 2. *IST Defendants Committed to DDS Pursuant to Subdivision (a)(1)(B)(i)*

The court found that for IST defendants committed to DDS pursuant to section 1370.1, subdivision (a)(1)(B)(i), "the 'transfer of responsibility date is the date of service of the [section] 1370.1[, subdivision] (a)(2) order directing the IST defendant to be confined in a DDS facility or placed on DDS outpatient status." Neither party specifically challenges the court's transfer of responsibility point for this category of IST defendants committed to DDS. (See pt. VI., *post* [addressing plaintiffs' cross-appeal challenging the trial court's transfer of responsibility date for defendants committed to DDS pursuant to section 1370.1, subdivision (a)(1)(B)(ii) & (iii)].)

45

**B.** *The 28-Day Outer Limit for Commencing Substantive Services*

Defendants contend "[t]he trial court's determination that 28 days is the 'maximum constitutionally permissible delay' before provision of competency services is arbitrary and improper," made in reliance "on inapposite cases from other jurisdictions and various statutory provisions that bear no relationship to the admission of IST defendants" in California.

"So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience [citation], or interferes with rights 'implicit in the concept of ordered liberty' [citation]." (*U.S. v. Salerno* (1987) 481 U.S. 739, 746; accord, *Youngberg v. Romeo* (1982) 457 U.S. 307, 315 (*Youngberg*) ["The mere fact that Romeo has been committed [to a state institution for the developmentally disabled] under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment"].) "In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society' " by "weigh[ing] the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." (*Youngberg*, at p. 320.)

In determining the "statewide outside limit" for the commencement of substantive services for IST defendants to remedy the continuing violations of their due process rights, the trial court considered and gave "substantial weight" to a number of factors in reaching its conclusion that constitutional due process requires defendants to commence substantive competency services for IST defendants within 28 days of the transfer of responsibility date.[29]

---

[29] The court measured the 28-day days from the date of service of the transfer of responsibility document to the date of commencement of substantive services, rather than from the date of admission as most courts

## 1. *Balancing of Interests*

The court first considered and gave substantial weight to IST defendants' constitutional "interest in not being confined before conviction of a crime and in the absence of a finding that [the defendant] is a flight risk or a threat to public safety." The court found persuasive the analyses in three federal court cases also involving the statewide due process rights of IST defendants to timely treatment following commitment to a state hospital, in which the courts weighed the liberty interests of the defendants against the interests of the government. (See *Mink, supra,* 322 F.3d at pp. 1120–1122; *Trueblood, supra,* 101 F.Supp.3d at pp. 1020–1023; *Advocacy Center, supra,* 731 F.Supp.2d at pp. 621–624.)

The court therefore balanced three considerations: " 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " (*Today's Fresh Start, supra,* 57 Cal.4th at pp. 212–213.) The court observed that its "analysis track[ed] *Trueblood,*" *supra,* 101 F.Supp.3d at pages 1020–1023.

The court first considered IST defendants' fundamental right to liberty, given that they have not been convicted of any crime and their incarceration is not intended to be punishment. (See *Youngberg, supra,* 457 U.S. at pp. 320–321; *Trueblood, supra,* 101 F.Supp.3d at pp. 1020–1021; see also

have done, explaining that "[t]he purpose of commitment is not to simply relocate an IST defendant to another geographic location or transfer administrative responsibility for the IST defendant from the county jail to a state entity."

47

*Jackson, supra*, 406 U.S. at p. 738 [" 'due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed' "].) The court then found that IST defendants are at risk of an erroneous deprivation of this interest due to defendants' failure to promptly provide substantive services designed to promote speedy restoration to mental competence, and that a judicially defined constitutional outer limit would be a valuable additional procedural safeguard. (See *Today's Fresh Start*, *supra*, 57 Cal.4th at p. 213; *Trueblood*, at p. 1021.)

Although not explicitly discussed by the trial court in this portion of its order, the deprivation of IST defendants' liberty interest in freedom from incarceration is exacerbated by the undisputed harms these defendants suffer due to prolonged incarceration in county jails while awaiting transfer and treatment, which often delay their return to competence. (See, e.g., *Mille*, *supra*, 182 Cal.App.4th at p. 646 [quoting legislative history underlying section 1369.1, which states that IST defendants committed pursuant to sections 1370. and 1370.1 and kept in jails " 'usually get worse the longer they wait for admission to a Mental Health hospital' "]; *Mink*, *supra*, 322 F.3d at pp. 1119–1120 ["We are also mindful of the undisputed harms that incapacitated criminal defendants suffer when they spend weeks or months in jail waiting for transfer to" a state hospital, which delays their possible return to competency].)

The court then considered the government's interests, rejecting defendants' "evidence that they have fiscal constraints and are overburdened" because " '[n]either administrative inconvenience nor lack of resources can provide justification for deprivation of constitutional rights.' [Citation.]" (Quoting *In re Grimes*, *supra*, 208 Cal.App.3d at p. 1183; see *Mink*, *supra*,

322 F.3d at p.1121 [lack of funds, staff, or facilities cannot justify state's failure to provide IST defendants with treatment necessary for rehabilitation].)[30]  The court also found that defendants' "interest in the preparation and transmission of documentation" "cannot justify confining a person 'more than [the] reasonable period of time necessary,' " and noted that its "identification of transfer of responsibility dates take[s] into account the DSH's and DDS's need for documentation."

In examining defendants' interests, the court also considered the 90-day reporting requirement regarding the defendant's progress towards recovery of mental competence.  (§§ 1370, subd. (b)(1), 1370.1, subd. (b)(1).)  However, the court found that this 90-day period "is not particularly probative because the due process analysis concerns counting forwards from the time an IST defendant is in custody from the IST order to the commencement of substantive services.  In contrast, the 90-day period is useful only for purposes of counting backward from the statutory time frame for preparing a report."

We believe the 90-day report requirement reflects the Legislature's determination that defendants do not have an unlimited period of time in which to admit IST defendants, given that those defendants must begin receiving substantive services quickly enough for defendants to be able to

---

[30] The trial court did take into account administrative feasibility, but only for purposes of providing defendants with a 30-month period of time to gradually meet the constitutional deadline. (See *Today's Fresh Start*, *supra*, 57 Cal.4th at p. 213.)

The court also observed that the Legislature had recently lessened the administrative burden on defendants by enacting a diversion program (§ 1001.35) and by decreasing the time an IST defendant can spend in a state hospital from three years to two years (§§ 1370, subd. (c)(1), 1370.1, subd. (c)(1)(A), "which will free up bed space."

evaluate their progress and determine the likelihood that competency will be restored within 90 days. (See pt. III.B., *ante* [discussing differences in wording in section 1370 and 1370.1 regarding 90-day report deadline]; see also *Brewer*, *supra*, 235 Cal.App.4th at p. 137 ["In setting a deadline for transfer . . . the court is enforcing the statutory imperative for a meaningful progress report within 90 days of the commitment order," which requires the court to " 'ensur[e] that the defendant is actually transferred to the state hospital within a reasonable period of time' "]; accord, *Mille*, *supra*, 182 Cal.App.4th at p. 650.)

Therefore, this statutory provision *is* germane to the due process analysis. While it is by no means the only factor to be considered in determining the constitutional outer limit for commencement of services, the 90-day statutory requirement is an important and tangible guidepost. (See *Loveton*, *supra*, 244 Cal.App.4th at p. 1047 [trial court's order placed "an outside limit on what is statutorily and constitutionally permissible"].) Any other conclusion would render the 90-day progress report requirement meaningless.[31]

---

[31] Defendants point out that in *Loveton*, the trial court had based its 60-day outer limit for admission in part on the fact that DSH-Napa had "demonstrated it is capable within 17 to 21 days of admission of producing a meaningful report and that within such time a defendant can be duly evaluated and derive some benefit from the prescribed treatment." (*Loveton*, *supra*, 244 Cal.App.4th at p. 1036.) We found that this evidence was one of several factors supporting the trial court's determination that IST defendants must be admitted to DSH within 60 days of the commitment order, for purposes of DSH's separation of powers argument and petitioner's argument that due process required admission within 30 days of the commitment order. (*Id*. at pp. 1043–1044.) This evidence from *Loveton* regarding the time needed to prepare the 90-day report is not particularly helpful in determining the outer limit for due process in this case, given that the evidence cited in that case was pertinent only to DSH-Napa and was from 2014. (See also pt. III.C., *ante* [discussing the allegedly precedential nature of *Loveton's* 60-

Finally, in addressing the governmental interests involved, the court observed that "the State's primary governmental interest in regard to IST defendants is to bring those accused of a crime to trial." (Citing Cal. Const. art. 1, § 29 ["In a criminal case, the people of the State of California have the right to due process of law and to a speedy and public trial"]; see *Today's Fresh Start*, *supra*, 57 Cal.4th at p. 213; cf. *Trueblood*, *supra*, 101 F.Supp.3d at p. 1023 ["An efficient system that moves people through the competency process quickly will . . . increase the speed at which competent people are brought to trial, will increase the percentage of incompetent people who can be restored and thus brought to trial, and will reduce the amount of money that the public spends incarcerating people"].)

The trial court thus reasonably found, after weighing the relevant interests involved, that defendants' systematic deprivation of IST defendants' "substantive liberty interests under the Fourteenth Amendment" was a significant factor in determining the maximum constitutionally permissible delay in commencing substantive services. (*Youngberg*, *supra*, 457 U.S. at p. 315)

## 2. *Legislative Timelines*

The court next considered "legislative timelines" in three different statutory schemes that it believed were relevant to its determination of the constitutional outer limit for commencing substantive services. The court believed it was particularly helpful to look at relevant statutory schemes because plaintiffs were seeking relief on a statewide basis "to address system

---

day deadline].) Here, the parties have pointed to no evidence in the record regarding the amount of time DSH or DDS needs, following commencement of treatment, to evaluate a defendant and prepare a meaningful progress report.

wide due process violations rather than seeking relief for an individual based on individual facts."

The court first considered and gave particular weight to the timing requirements set forth in statutes governing IST defendants. (See §§ 1370, subd. (b)(1)(A) [if 90-day "report indicates that there is no substantial likelihood that the defendant will regain mental competence in the foreseeable future, the committing court shall order the defendant to be returned to the court . . . no later than 10 days following receipt of the report"]; 1372, subd. (a)(1) [if a state hospital "determines that the defendant has regained mental competence, the director or designee shall immediately certify that fact to the court"]; 1372, subd. (a)(2), (a)(3)(A) [once a sheriff receives a certificate of restoration from a state hospital or other facility, "[t]he sheriff shall immediately return the person from the state hospital or other treatment facility to the court for further proceedings"]; 1372, subd. (a)(3)(C) ["In all cases, the patient shall be returned to the committing court no later than 10 days following the filing of a certificate of restoration"].)

Second, the court considered "the phrase 'reasonable period of time' in light of" pretrial timelines in criminal matters generally, observing that "[t]he timelines in criminal prosecutions are fairly short." (Citing *Craft v. Superior Court, supra,* 140 Cal.App.4th at p. 1543 [measuring length of time between IST defendant's commitment to DSH and admission to a state hospital "against the much shorter timeframes established by the Legislature"]; see, e.g., §§ 825, subd. (a)(1) [at outset of criminal proceedings, "the defendant shall in all cases be taken before the magistrate without unnecessary delay, and, in any event, within 48 hours after his or her arrest"]; 1382, subd. (a)(3) [misdemeanor defendant in custody has right to a trial within 30 days after arraignment]; 859b [if defendant is in custody in a

52

felony case, "the magistrate shall dismiss the complaint if the preliminary examination is set or continued beyond 10 court days from the time of the arraignment, plea, or reinstatement of criminal proceedings" pursuant to section 1367 et seq.]; 1382, subd. (a)(2) [a felony case shall be dismissed "when a defendant is not brought to trial within 60 days of the defendant's arraignment on an indictment or information, or reinstatement of criminal proceedings pursuant to" section 1367 et seq.].)

Third, the court considered procedures for involuntary treatment under the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.) "only for guidance regarding timelines," acknowledging that the "substantive 'standards for commitment and release of persons sought to be civilly committed in this state are significantly different than those prescribed by' " section 1367 et seq. (Quoting *Davis*, *supra*, 8 Cal.3d at p. 805; see, e.g., Welf. & Inst. Code, §§ 5150 [72 hours in custody permitted for "assessment, evaluation, and crisis intervention"]; 5250 [after initial 72 hours, in certain circumstances, a person "may be certified for not more than 14 days of intensive treatment"]; 5270.15 [in certain circumstances, a person "may be certified for an additional period of not more than 30 days of intensive treatment"]; 5270.35, subd. (b)(1)-(3) [a person must be released after 30 days of treatment unless he or she agrees to further treatment or state proceeds with a conservatorship petition or a petition for treatment of a dangerous person].)

The court found that these timelines, though statutory rather than constitutional in nature and addressing somewhat different issues, "are relevant to determining the outer limit of constitutional due process" and "suggest that the [L]egislature has determined that it is not reasonable for the state to involuntarily confine a person for more than approximately 10-20

53

days without meeting some substantial threshold." Defendants maintain that the trial court's reliance on statutory provisions that are not directly applicable to the admission of IST defendants to DSH or DDS facilities was improper and led it to choose an arbitrary deadline that is not tethered to California case law or the relevant statutory deadlines. We disagree.

The court did not suggest that the statutes it considered directly addressed the due process outer limit at issue in this case. Rather, it found helpful parts of section 1370 and other criminal and civil commitment statutes that concern maximum time limits for holding criminal defendants without trial and for involuntarily hospitalizing mentally ill individuals because those provisions reflect the Legislature's determinations regarding the importance of keeping such individuals in custody no longer than absolutely necessary to the purpose for which they are being held. Considering the lack of directly applicable statutory provisions on the issue it was confronting, we believe the court reasonably considered the timelines of related statutory provisions as one of a number of factors it found useful in determining that a 28-day statewide due process deadline for IST defendants is necessary.

### 3. *Federal Case Law*

Finally, the court considered and gave substantial weight to federal case law imposing statewide deadlines of between 7 and 21 days from commitment to admission of IST defendants in other states. (See *Mink*, *supra*, 322 F.3d 1101 [seven-day deadline in Oregon]; *Trueblood, supra*, 101 F.Supp.3d 1010 [seven-day deadline in Washington]; *Advocacy Center, supra*, 731 F.Supp.2d 603 [21-day deadline in Louisiana].)

Defendants argue that the trial court's reliance on cases regarding IST defendants in other jurisdictions was improper and contributed to its choice

54

of an arbitrary deadline. The court, however, did not rely on federal cases as precedent. Instead, it considered the analyses and conclusions of cases involving the nearly identical issue of *statewide* constitutional outer limits for admission of IST defendants—something absent from prior California case law—and found them persuasive. (See *Etcheverry v. Tri-Ag Service, Inc.*, *supra*, 22 Cal.4th at p. 320; *People v. Bradley*, *supra*, 1 Cal.3d at p. 86.) Based on its consideration of these federal cases addressing statewide systems, the court reasonably concluded that "*Mink*, *Trueblood*, and *Advocacy Center* strongly suggest that a constitutionally 'reasonable period of time' is 28 days or fewer in the context of statewide systems."[32]

In sum, in view of the trial court's careful consideration of the extensive evidence presented about IST defendants and defendants' processes throughout California, its thorough analysis of the relevant case law and statutory schemes in light of that evidence, and its balancing of the individual liberty and governmental interests involved, we conclude the court acted within its broad discretion when it found that due process requires that defendants commence substantive competency services for IST defendants with 28 days of service of the order transferring responsibility to DSH or DDS. (See *Butler*, *supra*, 4 Cal.5th at pp. 738–739; *Loveton*, *supra*, 244 Cal.App.4th at pp. 1042–1043.)[33]

---

[32] The court's determination that a 28-day deadline is appropriate in this case was based in part on the fact that "California has different procedures and requires different documentation than other states," which "suggests that 'a reasonable period of time' might be longer in California."

[33] As we shall explain when we address plaintiffs' cross-appeal in part VI., *post*, this 28-day deadline for commencing substantive services following service of the commitment order for defendants committed to DDS applies to *all* defendants committed under section 1370.1, not just those committed under subdivision (a)(1)(B)(i) of that section.

## V. *Existing Policy Mechanisms*

In their final contention, defendants state that "DSH and DDS are firmly committed to reducing the IST waitlist, and have been working diligently towards that end." They assert, however, that existing policy mechanisms are best positioned to address California's broader mental health crisis, which they maintain is at the root of the IST defendant waitlist.

Defendants cite evidence presented in the trial court showing that DSH has obtained funding from the Legislature for diversion programs, which are intended to keep potential IST defendants out of the criminal justice system. (See, e.g., Pen. Code, §§ 1001.35, 1001.36; Welf. & Inst. Code, § 4361, subd. (b).)[34] Defendants also point to evidence that DDS worked with the Legislature to increase Porterville's treatment program capacity, including by 25 percent in 2015 (see Welf. & Inst. Code, § 7502.5) and to authorize the creation of specialized enhanced behavior support homes in the community. According to defendants, these efforts underscore the fact that, in coordination with the Legislature and stakeholders in California's independent local governments, they have been and "will continue to work with other policymakers to address the IST waitlist and its root cause, and will do so using tools that are more likely to be effective than the tools available to the courts."

We have already described the evidence of defendants' ongoing endeavors to lessen delays, both independently and in conjunction with the Legislature and other governmental entities, and we commend their efforts.

---

[34] We have taken judicial notice of evidence submitted by both parties, which also shows that changes in the state budget affects DSH funding from year to year, which in turn impacts the possibility of expanding various programs and initiatives aimed at reducing the wait times for treatment of IST defendants.

Nevertheless, unconstitutional delays in providing substantive services to IST defendants committed to DSH and DDS have continued for many years, despite all of defendants' efforts.  This history demonstrates that existing policy mechanisms alone cannot cure the problem, and we must not allow systematic violations of the due process rights of these vulnerable defendants to continue, while hoping that defendants' efforts will eventually improve the situation.  (See *Loveton, supra*, 244 Cal.App.4th at p. 1045; cf. *Kareem A., supra,* 46 Cal.App.5th at p. 79 [trial court reasonably "concluded DSH did not have a valid excuse for violating commitment orders," considering that "DSH has had over a decade to evolve in order to meet the rising demand of IST beds, and yet the IST waitlist has continued to grow"].)

## VI. *Plaintiffs' Cross-Appeal*

The court found that, unlike other defendants committed to DDS, for IST defendants committed pursuant to section 1370.1, subdivision (a)(1)(B)(ii) or (iii), the transfer of responsibility date "is the date the IST defendant and the [section] 1370.1[, subdivision] (a)(3) documentation are delivered to a DDS facility."

Plaintiffs' cross-appeal concerns this one aspect of the trial court's order.  They contend the trial court erred in finding that the transfer of responsibility date for IST defendants committed to DDS pursuant to section 1370.1, subdivision (a)(1)(B)(ii) or (iii) is the date those defendants are actually *admitted* to Porterville or a state hospital, based solely on the documentation requirement set forth in subdivision (a)(3) of the statute.  Plaintiffs further contend that even if the court's determination was justified under the applicable provisions of section 1370.1, equal protection demands a uniform transfer-of-responsibility point for all IST defendants committed to DDS.

The court based the transfer of responsibility date for this category of IST defendants on the language of section 1370.1, subdivision (a)(3), which provides: "If the court orders that the defendant be confined in a state hospital or other secure treatment facility pursuant to clause (ii) or (iii) of subparagraph (B) of paragraph (1), *the court shall provide copies of the following documents, which shall be taken with the defendant to the state hospital or other secure treatment facility where the defendant is to be confined.*" (Italics added.) These required documents include criminal history information, arrest reports, and records of a finding of mental incompetence. (§ 1370.1, subd. (a)(3)(A)-(C).) The court reasoned that since section 1370.1, subdivision (a)(3) "requires that documents must accompany the IST defendant[,] transfers of responsibility under [section 1370.1, subdivision (a)(1)(B)(ii) and (iii)] are not complete until the IST defendant and the documents are delivered to a DDS facility." Because, under the court's interpretation, DDS is not responsible for IST defendants in this category until they actually arrive at a facility and plaintiffs had presented no evidence about postadmission delays in commencing treatment, the court further found that defendants had *not* systematically violated the due process rights of these defendants by failing to commence substantive services within a reasonable period of time. The court therefore denied plaintiffs' petition in part on that ground.

As we shall explain, we agree with plaintiffs that the trial court's determination of the transfer of responsibility date for IST defendants charged with sex offenses who are committed to DDS pursuant to subdivision (a)(1)(B)(ii) and (iii) of section 1370.1 was based on a misreading of the relevant statutory provisions, placing too much weight on the documentation requirement set forth in subdivision (a)(3) for these defendants.

58

Consequently, we conclude the court's finding was incorrect as a matter of law.  (See *Butler*, *supra*, 4 Cal.5th at pp. 738–739; accord, *Loveton*, *supra*, 244 Cal.App.4th at p. 1043.)  Instead, we find that the transfer of responsibility date for this category of IST defendants is identical to that of other IST defendants committed to a DDS facility or state hospital.[35]

First, in context, the only reasonable interpretation of the language in subdivision (a)(3) of section 1370.1—"the court shall provide copies of the following documents, which shall be taken with the defendant to the state hospital or other secure treatment facility where the defendant is to be confined"—is that copies of certain documents, which have already been provided to DDS for these and all other IST defendants committed to DDS, must physically accompany the defendant committed pursuant to subdivision (a)(1)(B)(ii) or (iii) of that section when he or she is delivered to the facility at which substantive services will be provided.  This additional requirement is plainly based on the Legislature's particular concerns about safely housing and treating this category of defendants, which it addressed by ensuring that facility staff has certain documentary information about these defendants immediately available upon their arrival.[36]

---

[35] Thus, the trial court's determination that plaintiffs systematically violate the due process rights of IST defendants committed to DDS under subdivision (a)(1)(B)(i) of section 1370.1, by failing to commence substantive services within 28 days of service of the commitment order is equally applicable to defendants committed under subdivision (a)(1)(B)(ii) and (iii) of that statute.

[36] Nearly identical language in other subdivisions of both section 1370.1 and section 1370 support this interpretation.  Sections 1370, subdivision (a)(6)(B) and 1370.1, subdivision (a)(5)(B) state that, when an IST defendant committed pursuant to subdivision (a)(1)(B)(ii) or (iii) of either statute is transferred to another facility, "copies of the documents specified in [subdivision (a)(3)] shall be taken with the defendant to each subsequent facility to which the defendant is transferred."  These provisions make clear

In addition, except for defendants committed pursuant to (a)(1)(B)(ii) and (iii) of section 1370.1, the trial court found that responsibility for IST defendants committed to DDS transfers upon service of the commitment order, presumably because there is no explicit requirement in the statute that the court provide any documents for those defendants. However, reading section 1370.1, subdivision (a)(3) in conjunction with the statutory and regulatory scheme as a whole, rather than in a vacuum, it is clear that long before any defendant's admission to Porterville or other facility, DDS is responsible for obtaining certain documents—and does obtain such documents, sometimes before receiving a commitment order—that are necessary to enable it to evaluate and place *all* IST defendants committed to its care, regardless of whether such documentation is explicitly mentioned in section 1370.1 itself.[37]

For example, multiple provisions of the Welfare and Institutions Code reflect the fact that DDS is the sole entity responsible for making admissions

that *both* statutes are intended to address the Legislature's concern with particular risks involved in admitting or transferring certain IST defendants charged with sex offenses. Although section 1370 explicitly states that the court must provide DSH with the commitment packet prior to admission, neither statute states or implies that defendants have no responsibility for these defendants—whether upon initial admission or a later transfer—until they are delivered, along with certain documents that should already be in defendants' possession, to a facility.

[37] In their opening brief, defendants set forth in detail DDS's processes for admitting IST defendants committed to its care. For example, they state that "[o]nce a court orders an IST defendant to receive competency training at Porterville, then the Porterville Regional Project, the DDS program that facilitates admissions to Porterville among other responsibilities, begins to gather the necessary documents from the court, the jail, and the regional center to process that defendant's admission." Defendants then describe the multiple additional steps required before an IST defendant committed to DDS ever arrives at a treatment facility.

determinations for IST defendants committed under section 1370.1, and for ultimately placing those defendants in a facility for provision of substantive services. As the court in *Williams* explained, under Welfare and Institutions Code section 4501, " '[t]he State of California accepts a responsibility for persons with developmental disabilities and *an obligation* to them which it *must* discharge' "; under Welfare and Institutions Code section 4416, "DDS is the entity charged with fulfilling this obligation." (*Williams*, *supra*, 228 Cal.App.4th at p. 1017, citing Welf. & Inst. Code, §§ 4416, 4501; see also, e.g., Welf. & Inst. Code, §§ 4418.7, subd. (b) [individuals referred to a developmental center must first be assessed and, if appropriate, visited to determine service and support needs]; 7502.5, subd. (a)(5) [same]; 7507 [DDS "shall admit" IST defendants committed to it].) The trial court's interpretation of section 1370.1, subdivision (a)(3) would thwart the Legislature's intent by permitting DDS to avoid its responsibility to act expeditiously to admit *all* IST defendants committed to its care so that those defendants can receive treatment intended to restore them to mental competence within a "reasonable period of time." (*Jackson*, *supra*, 406 U.S. at p 738.)

In addition, as previously discussed, Welfare and Institutions Code section 6510.5 provides that the court may not require DDS to admit "a dangerous person committed pursuant to section 1370.1 . . . to a developmental center if [DDS] has specifically notified the court in writing that the individual cannot be safely served in that developmental center." Obviously, DDS cannot determine whether an individual can be safely served at Porterville if it has not obtained and reviewed the relevant documentation beforehand, and it would never wait to make such a determination until the individual arrives, along with certain documents, at Porterville. (Cf.

*Williams*, *supra*, 228 Cal.App.4th at p. 1017 ["While Welfare and Institutions Code section 6510.5 may authorize the DDS to veto a *specific* developmental center placement, it does not give the DDS the authority to refuse to approve *any* placement"].) As defendants themselves acknowledge in their opening brief, upon a finding that an IST defendant cannot be safely served at Porterville, "DDS has an obligation to work with the regional center to find an alternative placement for competency treatment."[38]

As previously discussed, in 2018, DDS promulgated regulations governing its determination of whether it can safely admit any "dangerous person" committed pursuant to section 13701.1. (Welf. & Inst. Code, § 6510.5; see Cal. Code Regs., tit. 17, § 51101 et seq.) Accordingly, under the California Code of Regulations, title 17, section 51101, subdivision (a), "[i]f the Welfare and Institutions Code section 4418.7 assessment process indicates that the individual's admission to a developmental center would pose a threat to that person, persons already admitted to the developmental center, or the center's staff that cannot be mitigated . . . , and the developmental center is considering exercising its right under Welfare and Institutions Code section 6510.5 to deny admission to the person referred, then the director of the developmental center shall form a Safe-to-Serve Committee . . . to make an admission determination." (See also, e.g., Cal. Code Regs., tit. 17, § 51102, subd. (a) [within 15 days of receipt of 10 specified categories of documents, Safe-to-Serve Committee must meet to assess a defendant committed under Pen. Code, § 1370.1, based on Welf. & Inst. Code

---

[38] Some IST defendants committed to DDS pursuant to subdivision (a)(1)(B)(ii) or (iii) of section 1370.1, may be committed directly to a state hospital. Nonetheless, as defendants acknowledge and the relevant statutes, regulations, and evidence confirms, DDS has responsibility for all IST defendants committed under section 1370.1.

62

§ 4418.7 assessment and list of documents provided in "the admissions packet of information generated by the regional center regarding the person"];[39] Cal. Code Regs., tit. 17, § 51103, subd. (a) [within 15 days of receipt of information from regional center, Safe-to-Serve Committee "shall determine whether a committed individual should be admitted to the developmental center or denied admission pursuant to Welfare and Institutions Code section 6510.5"].)

By their terms, these regulations can only come into play *after* the clinical team at DDS has received and reviewed the relevant documentation and the assessment of the defendant and *after* it has determined that safety concerns require that a Safe-to Serve-Committee be formed to determine whether the defendant can be safely placed at Porterville or whether, pursuant to Welfare and Institutions Code section 6510.5, another placement will be necessary.

Finally, the evidence presented in the trial court also confirms that DDS takes responsibility for *all* IST defendants committed pursuant to section 1370.1 long before they arrive at Porterville or any other facility and that the procedures in place require the collection of all necessary documents, an interview and assessment of every defendant, and clinical review to determine, among other things, whether the defendant can safely be admitted to Porterville. All of this occurs well before admission. According to Sherrie Molina of the Porterville Regional Project, once she learns of an anticipated admission—either through receipt of the court's commitment

---

[39] Notably, several of the documents required to be considered by the Safe-to-Serve Committee overlap with the documents that must accompany the IST defendants charged with sex offenses to their placement under subdivision (a)(3) of section 1370.1. (Compare § 1370.1, subd. (a)(3)(A)-(C); Cal. Code Regs., tit. 17, § 51102, subd. (a)(3)-(5).)

order or earlier from the regional center that has evaluated the defendant—one of the first steps she takes is to collect various documents (the referral packet), which are required for each IST defendant committed to Porterville *prior to* any final admission determination. The documents needed for the referral packet are obtained primarily from the regional center, but also from the court, the district attorney, and/or the public defender.

In addition to the regional center's placement recommendation based on its evaluation of the defendant pursuant to subdivision (a)(2) of section 1370.1, the documentation Molina obtains includes, inter alia, court minute orders, "the felony complaint, rap sheet, and police reports in regards to the incident; the competency evaluations that were done, and any past psychological evaluations that were done; [and] the individual program plan . . . ." While the documentation is being collected, Porterville Regional Project staff conducts an assessment of each IST defendant, which involves an interview in jail followed by preparation of a report, pursuant to Welfare and Institutions Code sections 4418.7 and 7502.5, subdivision (a)(5).

Once the Welfare and Institutions Code section 4418.7 report is prepared and the referral packet is sufficiently complete, both are forwarded to the executive director, who then forwards it "to the clinical teams, which would include psychologists, social workers, doctors, program managers, in order to review it" to determine "where [the defendant] would fit within our facility, what do they need, what do they require, what would keep them safe, what keeps others safe, what type of training they would need, and which area it would be provided in." After the clinical team concludes its evaluation and the referral packet is returned to Molina, she admits the defendant by

contacting the sheriff's department for transportation of the defendant to Porterville.[40]

In sum, nothing in the relevant statutory scheme, regulations, or evidence regarding the procedures DDS utilizes materially distinguishes the admissions process for defendants committed to DDS pursuant to section 1370.1, subdivision (a)(1)(B)(ii) or (iii) from the admissions process for IST defendants committed to DDS under subdivision (a)(1)(B)(i), including those who are found to have safety concerns. Instead, the relevant statutes, regulations, and evidence, demonstrate that DDS assumes responsibility for all IST defendants committed to its care long before they arrive at Porterville or another treating facility. The only real difference is that the Legislature has determined that after all of the required documents are collected and utilized by DDS to determine the proper placement for certain defendants charged with sex offenses, copies of three of those documents must physically accompany them to Porterville, the state hospital, or other secure treatment facility to which they are admitted. (See § 1370.1, subd. (a)(3)(A)-(C).)

Any other interpretation would mean that the constitutional rights of one category of IST defendants could be systematically violated without repercussions for months, or indeed years, until any such defendant for whom DDS has not yet authorized admission to a treatment facility would have to

_____

[40] Theresa Billeci, designated as DDS's "person most qualified," also testified at her September 2017 deposition that every document DDS requires for the referral packet must be received prior to a defendant's admission to Porterville because those documents are used in the "clinical review that is done prior to the individual coming to us so that we're assured that we can safely serve the individual; that the individual's appropriate for the services and supports that are provided at Porterville['s] secure treatment area, [and] that the individual is not going to present a safety or security risk to other people that live there . . . ."

65

be either civilly committed or released after two years in jail without substantive services, unless that individual defendant could convince a judge that he or she should be admitted sooner. (See § 1370.1, subd. (c)(1)(A), (2)(A) ["At the end of two years from the date of commitment or a period of commitment equal to the maximum term of imprisonment provided by law for the most serious offense charged . . . , whichever is shorter, a defendant who has not become mentally competent shall be returned to the committing court" for dismissal of criminal charges or civil commitment proceedings]; cf. *Williams*, *supra*, 228 Cal.App.4th at p. 1017 [if "the trial court in this case is forced to release this defendant—charged with registerable sex offenses and previously convicted of registerable sex offenses—because the DDS has not provided a placement option, the responsibility for such action will lie with the DDS, not with the court"].) Such an interpretation would be both absurd and contrary to the statutory and regulatory scheme as a whole, as well as to the actual practices of DDS. It would also raise due process and equal protection concerns. We must presume that such a result was not intended by the Legislature. (See *People v. McKee*, *supra*, 47 Cal.4th at p. 1193; *Williams*, at p. 1010; see also *Satele v. Superior Court* (2019) 7 Cal.5th 852, 858 ["We consider [statutory] language in the context of the entire statute and the statutory scheme of which it is a part"].)

For these reasons, we will reverse the portion of the trial court's order finding that the transfer of responsibility date for IST defendants committed to DDS pursuant to section 1370.1, subdivision (a)(1)(B)(ii) or (iii) is different from those committed pursuant to subdivision (a)(1)(B)(i). For *all* IST

defendants committed to DDS pursuant to section 1370.1, the transfer of responsibility date is the date of service of the commitment order.[41]

## VII. *Conclusion*

Over the past several years, both this and other appellate courts have suggested that the legislative and/or executive branches are in the best position to fashion a statewide solution to the longstanding delays in transferring IST defendants to DSH and DDS for substantive services intended to return them to competency and enable them to stand trial. (*Loveton*, *supra*, 244 Cal.App.4th at p. 1048, fn. 19; *Brewer*, *supra*, 235 Cal.App.4th at p. 154 (conc. & dis. opn. of Nicholson, J.); *Williams*, *supra*, 228 Cal.App.4th at pp. 1018–1019.)  Despite recent legislative action and other initiatives discussed in this opinion, too many of these defendants' due process rights continue to be violated due to lengthy waits in county jails. For this reason, we conclude the trial court's imposition of a 28-day constitutional outer limit for commencement of substantive services was both appropriate and necessary.  (See *Kareem A.*, *supra*, 46 Cal.App.5th at p. 79; *Loveton*, at p. 1045; cf. *Brown v. Plata*, *supra*, 563 U.S. at p. 511.)[42]

---

[41] We once more point out that DDS may utilize the portion of the court's order stating that defendants will not be in violation of the judgment if they show good cause for failing to admit "a few IST defendants within the required timeframes" should factors beyond defendants' control delay admission of a particular defendant committed pursuant to section 1370.1, subdivision (a)(1)(B)(ii) or (iii).

[42] Importantly, as the trial court stated in its order, the 28-day deadline from the transfer of responsibility point to commencement of substantive services at a DSH or DDS facility is the maximum constitutionally reasonable period of time "to comply with minimum due process.  The [L]egislature or an agency may direct the DSH and DDS to commence substantive services in a shorter time period."

## DISPOSITION

The judgment is affirmed except as to that part of the judgment challenged in plaintiffs' cross-appeal, which is reversed. The matter is remanded to the trial court with directions to modify its order granting in part plaintiffs' petition for writ of mandate to reflect a uniform transfer of responsibility date for all IST defendants committed to DDS, as set forth in this opinion, and to likewise modify the judgment to reflect the views expressed in this opinion. Costs on appeal are awarded to plaintiffs.

                                         _____

                                         Kline, P.J.

We concur:


_____

Stewart, J.


_____

Miller, J.


*Stiavetti et al. v. Clendenin, as Director, etc., et al.* (A157553)

69

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. Winifred Y. Smith |
| Attorneys for Plaintiffs and Appellants: | Sullivan & Cromwell<br>Laura K. Oswell<br>Duncan C. Simpson LaGoy<br><br>Michael P. Murtagh<br><br>American Civil Liberties Union Foundation of Northern California, Inc.<br>Michael T. Risher<br>Kathleen Guneratne<br>Emilou H. MacLean<br><br>American Civil Liberties Union Foundation of Southern California, Inc.<br>Peter J. Eliasberg |
| Attorneys for Amici Curiae on behalf of Plaintiffs and Appellants: | Contra Costa County Public Defender<br>Robin Lipetzky<br><br>California Public Defenders Association<br>Stephanie Regular |
| Attorneys for Defendants and Appellants: | Attorney General of California<br>Xavier Becerra<br><br>Cheryl L. Feiner<br>Senior Assistant Attorney General<br><br>Gregory D. Brown<br>Jennifer G. Perkell<br>Susan M. Carson<br>Supervising Deputy Attorneys General<br><br>Carolyn Tsai<br>Julia A. Clayton<br>Kevin L. Quade<br>Deputy Attorneys General |